[This opinion has been published in *Ohio Official Reports* at 87 Ohio St.3d 455.]

**CINCINNATI BAR ASSOCIATION *v*. STIDHAM.**

**[Cite as *Cincinnati Bar Assn. v. Stidham*, 2000-Ohio-476.]**

*Attorneys at law—Misconduct—Two-year suspension with second year stayed—Failure to deposit client funds into an identifiable bank account—Failure to maintain records of funds and render appropriate accounts—Failure to promptly pay funds that client is entitled to receive—Neglect of an entrusted legal matter—Failure to seek lawful objectives of client—Failure to carry out contract of employment—Prejudicing or damaging client—Concealing or knowingly failing to disclose what attorney is required by law to reveal—Disregarding a standing rule of a tribunal—Conduct involving dishonesty, fraud, deceit, or misrepresentation—Conduct adversely reflecting on fitness to practice law—Using firm name containing name of one not a member of the firm—Holding oneself out as having a partnership with one who is not a partner.*

(No. 99-1156—Submitted September 15, 1999—Decided January 5, 2000.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 98-43.

———————————

{¶ 1} On March 30, 1999, relator, Cincinnati Bar Association, filed a second amended complaint charging respondent, Chuck Ray Stidham of Cincinnati, Ohio, Attorney Registration No. 0031507, with violating several Disciplinary Rules. The parties entered into numerous stipulations of fact and also stipulated to multiple rules violations prior to a hearing before a panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court ("board"). After the stipulations were entered into, relator withdrew several charged

Disciplinary Rule violations.

**{¶ 2}** The charges against respondent relate to six separate matters. Five of the matters, relating to grievances concerning respondent's handling of legal affairs, are contained within Count One of relator's complaint. The sixth matter, concerning respondent's alleged use of a firm name containing the name of an attorney not a member of the firm, and also alleging that respondent held himself out as having a partnership with an attorney who is not a partner, is detailed in Count Two of relator's complaint.

**{¶ 3}** The hearing before the panel was held on May 24, 1999. Following the hearing, the panel determined findings of fact generally based upon the stipulations entered into by the parties. The panel's conclusions of law, with several exceptions, are also generally based upon the stipulations of rules violations entered into by the parties. The six separate matters are detailed below.

## I. Count One

### A. The Feltner Matter

**{¶ 4}** In this matter, the panel adopted the relevant stipulations as its findings of fact.

**{¶ 5}** In August 1994, Barbara Feltner hired respondent to represent her in an appeal in a personal injury case, and respondent, on September 1, 1994, filed a notice of appeal on Feltner's behalf. Respondent accepted a $1,000 retainer from Feltner for attorney fees and did not deposit the retainer in his trust account. Respondent failed to keep time records regarding the work he performed on the appeal.

**{¶ 6}** On February 27, 1997, respondent received a certified letter from Feltner requesting an accounting of all funds expended on her appeal, as well as an accounting of funds in another case that respondent handled on behalf of Feltner's minor son, and the return of all files. Respondent did not provide Feltner with the accountings and did not return the files.

**{¶ 7}** The panel adopted the relevant stipulated violations as its conclusions of law, concluding that respondent violated DR 9-102(A) (failure to deposit client funds into an identifiable bank account), 9-102(B)(3) (failure to maintain records of funds and render appropriate accounts), and 9-102(B)(4) (failure to promptly pay funds that a client is entitled to receive).

### B. The Caldwell Matter

**{¶ 8}** In this matter, the panel also adopted the relevant stipulations as its findings of fact.

**{¶ 9}** Kimberly A. Caldwell retained respondent in June 1993 to represent her in a divorce action. On July 2, 1994, Caldwell was shot in the chest by her husband. Caldwell then became interested in filing a reparations application with the Court of Claims of Ohio, Victims of Crime Division, seeking the recovery of expenses she incurred due to the shooting.

**{¶ 10}** After Caldwell and respondent discussed the application, Caldwell brought a blank application form to respondent's office, and respondent's secretary typed in information provided by Caldwell. Respondent wrote "will provide other information when available" on page three of the form.

**{¶ 11}** Caldwell signed the application on July 2, 1995, and left it at respondent's office. Respondent signed the application as Caldwell's attorney. At the time, respondent believed that the application was required to be filed within one year of the date of the perpetrator's conviction. Caldwell's application remained in respondent's office from July 1995 until Caldwell picked it up in August 1996. Caldwell sent her application to the Court of Claims, where it was rejected for being untimely filed.

**{¶ 12}** Caldwell filed a civil action against respondent and the attorney who shared office space with him. The matter was settled for $11,000, to be paid by respondent over a period of time. At the time the stipulations were entered into, a total of $9,000 had been paid. The case was dismissed without prejudice at the time

of the settlement, and the settlement provided that it would be dismissed with prejudice upon completion of the payments.

**{¶ 13}** The panel adopted the relevant stipulated violations as its conclusions of law, concluding that respondent violated DR 6-101(A)(3) (neglect of a legal matter entrusted to him), 7-101(A)(1) (failure to seek the lawful objectives of the client), 7-101(A)(2) (failure to carry out a contract of employment), and 7-101(A)(3) (prejudicing or damaging a client).

### C. The Rose Weiss Estate

**{¶ 14}** In this matter, the panel also adopted the relevant stipulations as its findings of fact.

**{¶ 15}** Respondent was retained in January 1997 to represent the estate of Rose W. Weiss. On February 12, 1997, respondent opened the estate. On March 18, 1997, respondent requested and received from the executor a check for $18,750 for attorney fees. The parties stipulated that under both a local rule of the Hamilton County Probate Court and the Rules of Superintendence for the Courts of Ohio, attorney fees for the administration of estates are not to be paid until the final account is prepared for filing, unless otherwise approved by the court upon application and for good cause shown. Respondent never applied to the probate court for permission to receive his attorney fees early. Respondent was required to pay $1,313.91 plus a penalty to the estate for taking attorney fees prematurely.

**{¶ 16}** The panel adopted the relevant stipulated violations as its conclusions of law, concluding that respondent violated DR 7-102(A)(3) (concealing or knowingly failing to disclose what an attorney is required by law to reveal) and 7-106(A) (disregarding a standing rule of a tribunal).

### D. The Ruth Bollmer Estate

**{¶ 17}** In this matter, the panel also adopted the relevant stipulations as its findings of fact. The situation was very similar to that of the Rose Weiss estate, with respondent collecting $18,570.60 in attorney fees from the estate in 1997

4

before the final account was prepared for filing, and without obtaining the permission of the probate court. Respondent was required to pay $1,193.75 plus a penalty to the estate for taking attorney fees prematurely.

{¶ 18} The panel adopted the relevant stipulated violations as its conclusions of law, concluding that respondent violated the same disciplinary provisions as he had violated in the administration of the Rose Weiss estate.

E. The Adkins Matter

{¶ 19} In this matter, the panel adopted the relevant stipulations as its findings of fact and also entered several additional findings of fact.

{¶ 20} On September 26, 1998, Sandra D. Adkins and Sharon Bryant entered into a contract for Adkins to sell her bar to Bryant. Respondent did not draft the contract. Bryant was the client of respondent. Adkins was not respondent's client.

{¶ 21} Pursuant to the purchase agreement, $37,000 of the purchase price of $74,000 was to be held in escrow until the liquor license was transferred and until certain obligations were satisfied. Respondent agreed to act as escrow agent and took possession of the $37,000. Respondent agreed to prepare all necessary paperwork to accomplish the transfer of the liquor license from Adkins to Bryant. Respondent told Adkins that the transfer would be completed in six to twelve weeks.

{¶ 22} Respondent did not open an escrow account on behalf of Adkins. Instead, on September 30, 1998, respondent deposited the $37,000 into his IOLTA account at Valley Central Savings Bank in Reading, Ohio. Before this deposit was made into the IOLTA account, there was no money in the account. Respondent also maintained a business account for his law practice and a personal checking account held jointly with his wife at Valley Central Savings Bank.

{¶ 23} Between October 1, 1998 and February 18, 1999, approximately fifty-seven checks were written on respondent's IOLTA account. Only a few of

these checks involved the sale of the bar. Respondent himself wrote more than twenty checks. Almost all of those checks were written to pay court costs, settlements, and other charges involving matters that were not related to the sale of the bar. During this period, respondent made deposits into the IOLTA account in excess of $43,000 from other sources.

{¶ 24} Respondent authorized more than fifteen transfers of funds from his IOLTA account into either his business account or his personal account at Valley Central Savings Bank between October 14, 1998 and February 10, 1999. During this time, respondent's office expenses were being paid from his business account and his personal living expenses were being paid from his personal checking account.

{¶ 25} By late January 1999, the balance in respondent's IOLTA account was $234.84. In January 1999, Adkins inquired of respondent about the location and status of the money. Respondent wrote Adkins a letter dated January 22, 1999, regarding the funds, but did not give Adkins any information identifying the account holding the escrowed funds, and did not give the balance of the account. In this letter respondent stated, "I sincerely apologize that you believe that I have absconded with your funds. This could not be further from the truth." Respondent also stated, "I assure you that there is nothing untoward, nor out of the ordinary happening with those funds." The panel found that respondent also threatened Adkins in this letter, apparently based on respondent's statement in the letter suggesting that he would take legal action against Adkins if she continued to question his handling of the funds, and his accompanying statement that "if I hear that you have impugned my name and reputation in any way, I assure you this is a nightmare that you do not want to become involved in."

{¶ 26} On February 17, 1999, the day respondent was notified of Adkins's grievance against him, the balance in the IOLTA account was $3,755.24. Respondent on that day presented three cash advance checks on credit card

accounts totaling $25,000 to Valley Central Savings Bank for deposit into the IOLTA account. Valley Central Savings Bank refused to accept the checks after determining that they would not be honored. The next day, respondent made two cash deposits, one in the amount of $9,900 and one in the amount of $9,950, into a bank account at Fifth Third Bank in the name of a business owned by respondent's wife. The money for these deposits came from a safe in respondent's office.

**{¶ 27}** Later that day, respondent presented Valley Central Savings Bank with a check in the amount of $19,850 written on his wife's business account at Fifth Third Bank. This check did not clear until the next day. On February 18, 1999, respondent also deposited cash in an amount in excess of $9,000 at Valley Central Savings Bank.

**{¶ 28}** On February 18, 1999, respondent obtained from the manager of Valley Central Savings Bank a letter confirming that the current balance in the IOLTA account was $32,755.24. Respondent submitted this letter to relator along with his initial response to Adkins's grievance.

**{¶ 29}** On February 23, 1999, relator told respondent that he should open a separate account for the escrowed funds. On February 24, 1999, respondent withdrew $29,705.24 from the IOLTA account at Valley Central Savings Bank and opened a new IOLTA account, a new business account, and a separate account for the escrow funds at Firstar Bank in Reading, Ohio. On March 4, 1999, respondent obtained a cashier's check payable to both Adkins and Bryant in the sum of $32,190.21, and turned it over to them. This $32,190.21 was what remained of the original escrow account amount of $37,000 after bills and expenses were paid pursuant to the escrow agreement.

**{¶ 30}** The panel concluded in this matter that respondent violated DR 1-102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation) and 1-102(A)(6) (conduct adversely reflecting on a lawyer's fitness to practice law). The panel concluded that two other alleged violations, of DR 9-102(B)(3) and 9-

102(B)(4), were not proven.

## II. Count Two

{¶ 31} In this count, the panel adopted the relevant stipulations as its findings of fact.

{¶ 32} When relator's complaint was filed, respondent and attorney Christopher J. Bernard practiced law under the firm name of Sand, Stidham & Bernard, even though respondent and Bernard have never been partners and are not members of the same law firm. The two merely shared office space. The parties stipulated that as recently as January 29, 1999, respondent continued to use letterhead with "Sand, Stidham & Bernard" printed on the top.

{¶ 33} The panel concluded in this count that respondent violated DR 2-102(B) (using a firm name containing the name of one not a member of the firm) and 2-102(C) (holding oneself out as having a partnership with one who is not a partner).

{¶ 34} After reviewing the mitigation evidence, the panel considered that respondent grew up in a home with an alcoholic father and a clinically depressed mother, and that respondent had served his country in the United States Air Force during the Vietnam war era until his honorable discharge. The panel also considered the numerous physical ailments suffered by respondent, and respondent's clinical depression, which respondent dated to the 1990 death of his law partner, mentor, and friend, Robert Sand.

{¶ 35} The panel recognized that respondent accepted fault for his problems and acknowledged responsibility for his acts, and that respondent attributed many of his ethical lapses to his depression and to the increased workload respondent assumed upon the death of Sand. Furthermore, the panel considered respondent's assertions that he had "turned the corner" regarding the depression and that he had modified office practices to prevent future ethical problems. However, the panel expressed concerns about the truthfulness and candor of respondent in the Caldwell

matter and in the Adkins matter. The panel concluded that in the Adkins matter, respondent acted with the intent of misleading relator about his wrongdoing, and reasoned that respondent's depression "does not prohibit him from distinguishing right from wrong." The panel recommended that respondent be indefinitely suspended from the practice of law. The board adopted the findings, conclusions, and recommendation of the panel.

_____

*Sandra P. Kaltman* and *David T. Croall,* for relator.

*H. Fred Hoefle,* for respondent.

_____

**ALICE ROBIE RESNICK, J.**

{¶ 36} We adopt the findings of fact and conclusions of law of the board, but not its recommendation. Respondent principally takes issue with two aspects of the board's report, and so objects to the board's findings of fact, conclusions of law, and recommended sanction. Respondent's major points of contention involve (1) some of the board's findings of fact and conclusions of law in the Adkins matter, particularly the board's conclusion that he violated DR 1-102(A)(4) by engaging in willful deceit, and (2) his position that the board failed to take all mitigating factors into account, particularly the effects of his depression, in recommending an indefinite suspension as a sanction.

{¶ 37} Issues relating to respondent's depression color our consideration of both of his major points of contention.

{¶ 38} In disciplinary cases, the relator must prove that the respondent committed the alleged violations by clear and convincing evidence. See Gov.Bar R. V(6)(J); *Ohio State Bar Assn. v. Reid* (1999), 85 Ohio St.3d 327, 708 N.E.2d 193, paragraph two of the syllabus. Respondent argues that relator did not fully meet its standard of proof.

{¶ 39} With regard to the board's conclusion that respondent violated DR

1-102(A)(4) in the Adkins matter, we accept the findings of fact and also this accompanying conclusion of law, but with a caveat. When respondent's depression is taken into account, respondent's assertions that he ignored all the warning signs that would have alerted a reasonable attorney that something was seriously wrong in his handling of the escrow account do seem somewhat credible.

{¶ 40} Respondent testified that he simply tossed all of his bank statements aside without opening them since sometime in 1996, so that he was totally unaware of the huge problems that had arisen in his handling of the money at issue. Respondent further testified that he had an understanding with Valley Central Savings Bank that if one of his several different accounts there ran short of funds, bank employees would call him and get his authorization to shift the money around to the fund that needed it. Respondent testified that he routinely gave the approval without realizing that it often was the IOLTA account that was being depleted to raise the balances in other accounts. Respondent stated that he made deposits of more than $43,000 into the IOLTA account from sources other than Adkins, and further stated that his safe at all times contained enough cash to cover Adkins's escrow amount. Therefore, respondent claims, Adkins, who was never his client, was never in any danger of losing the money.

{¶ 41} However, after thoroughly reviewing the entire record, we can appreciate how the panel members could have become convinced that respondent's testimony that he ignored all the warning signs in the Adkins matter was lacking in credibility. The severity of the problems in the Adkins matter accelerated to a point that, even if one accepts at face value respondent's testimony that he committed no intentional misconduct but was merely negligent, the degree of obliviousness to the problems became exacerbated so that it could be viewed as the equivalent of intentional deceit. In addition, when Adkins inquired about the funds in the account, respondent told her, "I assure you that there is nothing untoward * * * happening with these funds," apparently without even checking into the matter at

that time to verify the truth of what he was stating. Considering that the board's finding of a violation of DR 1-102(A)(4) in this situation was effectively a mixed determination of fact and law, and that the panel had an opportunity to evaluate the credibility and demeanor of the witness through his actual testimony, we will not second-guess the panel's and board's determinations.

{¶ 42} Nevertheless, we are impressed that respondent's battle with the debilitating effects of his depression is genuine, and recognize that the possibility remains that respondent actually was subjectively unaware of the numerous warning signs all around him that normally would have indicated problems with the IOLTA account. Respondent acknowledged at the hearing that when everything came to light, he knew that he had "totally screwed it up" in handling the funds. Due to his depression, respondent was not functioning as a reasonable attorney in his approach to this entire matter, but at times was paralyzed into inaction by his depression. When, however, he did become aware of the magnitude of the problems, he took immediate steps to correct them.

{¶ 43} In sum, although we do not second-guess the board's finding of a violation of DR 1-102(A)(4) in the Adkins matter, the circumstances surrounding that violation affect our evaluation of what sanction is appropriate.[1]

---

1. We note at this point that, although the board also found that respondent was not totally truthful and candid in the Caldwell matter, the record appears to support respondent's contentions that once he realized that he had earlier had a mistaken impression regarding the events in that episode, he recanted his previous resistance to Caldwell's claims against him, admitted his mistake, and settled the claims for more than they may have been worth. Since respondent stipulated to all four violations charged in that matter, and since the board adopted the stipulated facts as its findings of fact without adding any further findings, respondent does not directly challenge the findings of fact and conclusions of law with respect to the Caldwell matter, but takes issue with the board's comment that he was less than truthful.

In addition, we also recognize that the board's finding that respondent attempted to mislead relator in the investigation of the Adkins matter is similarly based on the board's interpretation of events that could have been viewed differently. In the same way that we accept the board's findings of fact and conclusions of law in the Adkins matter, we do not separately address or specifically agree with respondent's contention that the board misinterpreted the record in reaching the conclusion that respondent intended to mislead relator.

**{¶ 44}** Respondent contends that the board, in recommending an indefinite suspension, did not give enough weight to all the mitigating factors present, including his depression. We agree that there are significant mitigating factors. Respondent was cooperative with relator, allowing the parties to achieve extensive stipulations of fact in the matters at issue. Respondent also stipulated to most of the violations charged by relator. Respondent had an exemplary record in the military service of this country. Many letters attesting to respondent's character and standing in the legal community were supplied to the board by respondent from judges and lawyers who had come into contact with respondent in his practice of law. Respondent has no prior disciplinary history. Respondent shows remorse for what he has done, takes responsibility for his actions, and has changed his office and accounting practices to prevent future problems. Respondent has suffered from many physical ailments during the time of the events at issue.

**{¶ 45}** In addition, as stated above, we are convinced that respondent's depression had a severe and debilitating effect on his ability to function as an attorney. The depression manifested itself most directly in the Adkins matter, but also appears to have played a role in some of the other matters, notably the Feltner matter and the Caldwell matter. The stipulations of fact, particularly in the Adkins matter, support respondent's position on the severity of the depression.

**{¶ 46}** Respondent's treating psychiatrist, J. Stephen Meredith, M.D., provided testimony and a letter detailing respondent's condition that was entered into evidence by respondent at the disciplinary hearing. Dr. Meredith diagnosed respondent with dysthemia and major depression—recurrent. Dr. Meredith explained that respondent in his depression has experienced feelings of guilt, loss of energy, distraction, preoccupation, anxiety, feelings of worthlessness, crying spells, suicidal thoughts, social withdrawal, and sleep impairment. Dr. Meredith stated that depression can impair the ability to follow up or to do needed things, and that one who suffers from depression sometimes is unable to do what to

observers appear to be very simple tasks. Dr. Meredith also testified that respondent often did not feel able to take care of details, so that respondent would allow routine matters to go unattended, and that problems would worsen while respondent put off dealing with them.

{¶ 47} Dr. Meredith stated that he believed that respondent is fit to practice law, and that there had been recent improvements in respondent's condition. He also stated that respondent needs continuing treatment, and that respondent's prognosis for recovery is good.

{¶ 48} Respondent testified at the hearing about his struggle with depression, detailing his inability to get any quality sleep, and graphically describing his feelings of hopelessness and worthlessness, as well as his despair, exhaustion, and anxiety. Respondent stated that he is now "dealing with it," in part due to recent successes with medications. He explained that he still has depression symptoms, including problems sleeping, but that he feels that his recent treatment causes him to be optimistic.

{¶ 49} At the same time that we acknowledge the severity of respondent's depression, we cannot overlook the way that depression manifested itself in the multiple disciplinary violations respondent has committed. Even though it does not appear that anyone was seriously hurt by respondent's ethical violations, his fitness to practice law has been called into question.

{¶ 50} In balancing all the considerations, we conclude that a two-year suspension, with the second year of the suspension stayed, is the appropriate sanction. In addition, respondent must submit to a monitoring program established by relator, including the terms we detail below, and must satisfy the conditions we impose as a prerequisite to resuming the practice of law.

{¶ 51} Even though Dr. Meredith stated that respondent was making progress with his treatment, Dr. Meredith also expressed an opinion that respondent's recovery might have progressed more rapidly in the past if respondent

had scheduled more treatment visits, and if respondent had devoted more time to his treatment. As a part of the monitoring obligations we impose, we require relator, respondent, and respondent's treating therapist (presumably Dr. Meredith) to agree upon a treatment schedule that requires respondent to undergo more consistent treatment than he has in the past. In addition, we impose the further requirement that respondent's treating therapist submit reports to relator, on a schedule established by relator, concerning the course of treatment.

{¶ 52} As a prerequisite to respondent's resumption of the practice of law at the end of the first year of the suspension, we require respondent to comply with the monitoring conditions, and we require respondent to submit evidence to the court establishing that he is at that time managing the depression and is capable of returning to the practice of law. If these requirements are fulfilled, and respondent returns to the practice of law, we require the monitoring to continue during the second year of respondent's suspension. Costs taxed to respondent.

*Judgment accordingly.*

DOUGLAS, F.E. SWEENEY and LUNDBERG STRATTON, JJ., concur.

MOYER, C.J., PFEIFER and COOK, JJ., dissent.

_____

**Cook, J., dissenting.**

{¶ 53} I agree with the majority's decision to adopt the findings and conclusions of the board, but I respectfully dissent from the majority's decision to impose a more lenient sanction than the board recommended. I do not believe that the majority should have assigned weight to respondent's depression as a mitigating circumstance in regard to the disciplinary violations that respondent committed in the Adkins matter. Depression symptoms of inattention or unawareness should not bear any mitigating weight in the application of the appropriate sanction in light of the explicit deceit and threats contained in respondent's letter to Adkins.

{¶ 54} The ABA Standards for Imposing Lawyer Sanctions provide that

14

before aggravating or mitigating circumstances are considered, *disbarment* is appropriate for disciplinary violations of the character that respondent committed in the Adkins matter. See ABA Center for Professional Responsibility, Standards for Imposing Lawyer Sanctions (1991 and Amend.1992), Standard 5.1. Under the ABA Standards, "[d]isbarment is generally appropriate when * * * a lawyer engages in * * * intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice." Standard 5.1.

{¶ 55} After failing to open an escrow account on behalf of Adkins as he had agreed to do, and after mishandling the funds that were to be escrowed, respondent answered Adkins's inquiry (about the location and status of the funds) with a misleading and threatening letter. For these acts, the panel and board determined that respondent engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation in violation of DR 1-102(A)(4). A lawyer who engages in deceitful or dishonest conduct "has violated one of the most basic professional obligations to the public, the pledge to maintain personal honesty and integrity." Standard 5.1, Commentary.

{¶ 56} My initial determination of disbarment as the appropriate sanction would give way to the board's lesser recommended sanction—indefinite suspension—due to the presence of several mitigating factors in this case. Respondent's military service in Vietnam and his honorable discharge from the armed services attest to his positive character and reputation. His cooperative attitude toward the disciplinary proceedings, lack of prior disciplinary record, and effort to modify his questionable office practices are additional mitigating factors recognized in both the ABA Standards and the Board of Commissioners' Proposed Guidelines for Imposing Lawyer Sanctions. Cf. ABA Standards, *supra*, Standard 9.32; Board of Commissioners on Grievances and Discipline, Proposed Rules and Regulations Governing Procedure on Complaints and Hearings, Section 10,

Guidelines for Imposing Lawyer Sanctions, 87 Ohio St.3d xliv-xlvi.

{¶ 57} I would, therefore, accept the board recommendation to indefinitely suspend respondent rather than disbar him. The majority's decision to credit additional mitigation centers on its willingness to accept respondent's depression as an explanation for respondent's behavior in the Adkins matter. The majority concludes that due to respondent's depression, "the possibility remains that respondent actually was *subjectively unaware* of the numerous warning signs all around him that normally would have indicated problems with the IOLTA account." (Emphasis added.)

{¶ 58} The tone and language of respondent's letter, however, belie the majority's assertion that the respondent could have been "subjectively unaware" of what was happening. Respondent *explicitly assured* Adkins that there was nothing "untoward" or "out of the ordinary" happening with the funds, and *explicitly threatened* Adkins with a "nightmare" if respondent felt that Adkins was impugning his name or reputation.

{¶ 59} I do not suggest that clinical depression may never constitute a mitigating factor under appropriate circumstances. And like the majority I believe that respondent's battle with depression is genuine. However, due to the tone and content of the Adkins letter, I do not believe that respondent was "paralyzed into inaction" or was "subjectively unaware" of what was happening when he committed the disciplinary violations in the Adkins matter.

{¶ 60} For these reasons, I would have accepted the board's recommendation to indefinitely suspend respondent.

MOYER, C.J., and PFEIFER, J., concur in the foregoing dissenting opinion.

_____