ALLEN COUNTY BAR ASSOCIATION *v.* LINNON.

[Cite as *Allen Cty. Bar Assn. v. Linnon,*
104 Ohio St.3d 189, 2004-Ohio-6386.]

(No. 2002–1446—Submitted June 29, 2004—Decided December 8, 2004.)

PFEIFER, J.

{¶ 1} Respondent, Craig M. Linnon of Ada, Ohio, Attorney Registration No. 0062690, was admitted to the practice of law in Ohio in 1994. On January 7, 2002, relator, Allen County Bar Association, charged respondent in a third amended complaint with having violated the Code of Professional Responsibility. Although respondent moved to dismiss the original complaint and answered the second amended complaint, he did not answer the complaint as amended the third time.

{¶ 2} The Board of Commissioners on Grievances and Discipline scheduled a hearing in the cause for June 28, 2002. Although notice of the hearing was sent to an address at which respondent agreed to accept service, he did not appear. In his absence, relator's counsel agreed to a hearing panel of two after learning that the third panel member was unavailable to attend. The two-member panel thereafter made findings of fact, conclusions of law, and a recommendation, all of which the board adopted.

### Board Findings of Misconduct

{¶ 3} The allegations in the complaint originated with six aggrieved clients and were delineated in separate counts in the board's report. Another charge concerned respondent's uncooperative behavior during relator's investigation. The board dismissed three of the counts concerning client grievances because the grievants could not appear at the hearing. See Gov.Bar R. V(6)(H).

{¶ 4} As to the first grievance, evidence established that Jean D. Shurelds paid respondent $1,000 on February 25, 1998 to file a petition for judicial release on behalf of her incarcerated son. Over the ensuing months, Shurelds attempted many times to contact respondent about the status of her son's case but had no success. In September, with her son's November 1998 parole hearing approach-

ing, Shurelds filed a grievance with relator. On November 20, 1998, respondent finally filed the motion for judicial release, which was denied.

{¶ 5} Respondent defended his delay by asserting that he had deliberately waited to file the motion for judicial release until after the November 1998 election because he thought that a new judge more receptive to the motion might be elected. The incumbent judge won the election, however, and denied judicial release.

{¶ 6} The board found clear and convincing evidence that in representing Shurelds's son, respondent had violated DR 1–102(A)(5) (prohibiting conduct that is prejudicial to the administration of justice), 1–102(A)(6) (prohibiting conduct that adversely reflects on an attorney's fitness to practice law), 7–101(A)(1) (requiring an attorney to seek the lawful objective of a client through reasonable and lawful means), and 7–101(A)(3) (prohibiting an attorney from intentionally causing a client damage or prejudice).

{¶ 7} As to the second grievance, evidence established that in the summer of 1998, Kathleen Kuhbander retained respondent to file an appeal in a custody case. Kuhbander paid respondent $2,700, including $1,000 in attorney fees, $1,600 for the cost of the transcript, and $100 for the filing fee. Respondent filed notice of the appeal and thereafter requested a number of extensions to file a merit brief. On November 4, 1998, respondent voluntarily dismissed the appeal without Kuhbander's consent, later advising that he had decided instead to file contempt charges regarding her visitation rights. Respondent never filed the contempt charges, although the legal representation was not terminated until February 2000, when Kuhbander retained other counsel.

{¶ 8} The board found clear and convincing evidence that in representing Kuhbander, respondent had violated DR 1–102(A)(5), 1–102(A)(6), 7–101(A)(1) and 7–101(A)(3).

{¶ 9} As to the third grievance, evidence established that in June 1997, Maysie Rowlett retained respondent to assist her with a claim against a realtor. Rowlett paid respondent $255. At some point, respondent sent Rowlett a copy of a letter to an insurance carrier that he had sent on her behalf and a copy of the carrier's response; however, he did nothing more in the case as far as Rowlett could see for four years. Rowlett testified that she eventually lost contact with respondent and asked Legal Aid in her community for help.

{¶ 10} The board found clear and convincing evidence that in representing Rowlett, respondent had violated DR 7–101(A)(1) and (3).

{¶ 11} Finally, the board found clear and convincing evidence that respondent had committed additional violations of DR 1–102(A)(5) and (6) by refusing to cooperate during the investigation of this misconduct. During a meeting to

investigate the Shurelds grievance, respondent's "hostile," "obnoxious," and "aggressive" conduct struck relator's counsel as "bizarre." Respondent also delayed in responding to the Kuhbander grievance, including routinely failing to claim certified and other mail sent to various addresses at which he resided during the course of these proceedings.

{¶ 12} In fact, respondent's whereabouts were continually in question throughout relator's investigation. He closed and moved his regular office to an abandoned gas station, where he conducted a disorganized practice out of a parked recreational vehicle. Respondent later apparently practiced out of his home, providing a variety of post office boxes where he supposedly would accept mail. Respondent received notice and appeared for his deposition on March 22, 2001; however, grievance committee investigators were eventually unable to locate or communicate with him at all due to his overloaded voice mail and changing addresses.

### Recommended Sanction

{¶ 13} In recommending a sanction for this misconduct in 2002, the board looked for evidence of mitigating and aggravating factors in accordance with Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg.") The board noted respondent's lack of cooperation in the disciplinary process. See BCGD Proc.Reg. 10(B)(1)(e). The board identified none of the listed mitigating factors inasmuch as respondent did not appear at the hearing or answer the third amended complaint.

{¶ 14} "Each disciplinary case involves unique facts and circumstances," and "all relevant factors" are to be reviewed "[i]n determining the appropriate sanction" for misconduct. BCGD Proc.Reg. 10(A) and (B). Relying on the testimony of relator's investigator as to his personal experience with respondent, the board found that respondent had been a good student while in law school and had enjoyed a good reputation when he was first admitted to the bar. In recent years, however, the investigator attested that respondent had become less conscientious. Relator's counsel agreed that respondent had formerly been considered "a fine criminal defense lawyer," but over the last several years, a pattern of neglect and poor communication with his clients had emerged.

{¶ 15} The board recommended, consistent with the sanction proposed by relator and the hearing panel, that respondent be indefinitely suspended from the practice of law for his misconduct.

### Review of the Board's Report

{¶ 16} This is the second time that we have had before us the issues of respondent's misconduct and the appropriate sanction to impose. We initially

reviewed this cause last year, holding oral argument on March 12, 2003. At that time, respondent had filed objections to the board's report, claiming despite clear and convincing evidence to the contrary that he did not receive sufficient notice of the panel hearing and that the findings of misconduct were unproven.

{¶ 17} During oral argument, relator's counsel raised a concern that some in the local legal community apparently shared with relator—that respondent's neglect of clients and evasion of these proceedings had pathological roots. In fact, counsel related that had respondent cooperated in relator's investigation, relator might have moved for a mental illness examination on the authority of Gov.Bar R. V(7)(C). Replying, respondent conceded that he had suffered from what he believed to be a depressive state during the underlying events, even to the extent that he subsequently took a year off from practice.

{¶ 18} We therefore remanded this cause to the board for further proceedings, including a psychiatric examination pursuant to Gov.Bar R. V(7). On remand, we ordered the board to determine (1) respondent's ability to practice law, (2) respondent's current mental condition, and (3) respondent's mental condition "during the events that formed the disciplinary charges against him." As of March 25, 2003, we also suspended respondent's license to practice law as an interim measure for the public's protection.

{¶ 19} In accordance with our order, the board conducted and respondent assented to further proceedings that included an evaluation by psychiatrist Douglas Beech, M.D., a review of Beech's report, and a hearing to obtain respondent's testimony as to the medical findings. The board then made further findings of fact and conclusions of law and reconsidered the recommendation to indefinitely suspend.

{¶ 20} The board accepted the psychiatrist's finding that although respondent did suffer from "Adjustment Disorder" during the period in which he committed his misconduct, that condition does not qualify as a mental illness as defined in R.C. 5122.01(A). Pursuant to R.C. 5122.01(A), " '[m]ental illness' means a substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life." Additionally, the board adopted the psychiatrist's view that respondent's condition, attributable in large part to stressors in his personal and professional life that have since been resolved, is now in remission. Particularly symptomatic of respondent's disability, according to Dr. Beech, was the tendency to stumble over the "basic idea of *being right* (i.e. knowing or assuming what the outcome was going to be in a case) versus *doing the right thing* (i.e. informing and responding to clients and respecting their needs for communication about matters involving their cases)." (Emphasis sic.) The manifestation of this disorder, the board found, lay in respondent's indiffer-

ence to regularly advising clients and courts about what he considered to be legitimate decisions and actions on the clients' behalf.

{¶ 21} From respondent's testimony at the hearing, the board further found that respondent was "contrite for his failure to have attended the initial hearing" and that he "is fully cognizant of how he got into the difficulty which brought him before the Court, and now knows how to avoid these situations." According to the board:

{¶ 22} "[Respondent's] personality may have given rise to some of the original confrontations with the Bar Association, but it is our belief he now understands fully the problems this created, and this would not occur again. He was doing what he felt was best for his clients, but failed to communicate with his clients, and those who were trying to help him through the Bar Association. He now realizes it is imperative for him to maintain these lines of communication, and the [board] believes he will do so."

{¶ 23} In response to our second inquiry on remand, the board found that respondent's condition does not currently prevent him from practicing law in a competent and ethical manner. Consistent with the recommendations made in Dr. Beech's report, however, the board also concluded that a monitor should be appointed to oversee the propriety of respondent's communication with clients and his record-keeping practices. The board thus modified its previous recommendation and suggested that respondent receive a two-year suspension, with the second year stayed on the condition that, if reinstated, respondent submit to oversight by a monitor for two years. The board further recommended that respondent receive credit for the period his license has been under suspension since our order of March 25, 2003.

{¶ 24} On further review, we agree that respondent violated DR 1–102(A)(5), 1–102(A)(6), 7–101(A)(1), and 7–101(A)(3), as found by the board. We also agree that a two-year suspension with one year conditionally stayed is appropriate.

{¶ 25} Relator objects to the board's modified sanction, arguing mainly that respondent's psychiatric diagnosis was not significant enough to have a mitigating effect. We disagree. BCGD Proc.Reg. 10(B)(2)(g)(i), (ii), and (iv) provide that a mental disability may be considered mitigating upon a professional diagnosis of the disability, the professional's opinion that the disability contributed to the misconduct, and the professional's opinion that the disability, under specified conditions, will not compromise the attorney's ability to practice competently and ethically. Accord *Disciplinary Counsel v. Golden*, 97 Ohio St.3d 230, 2002-Ohio-5934, 778 N.E.2d 564, and *Cincinnati Bar Assn. v. Stidham* (2000), 87 Ohio St.3d 455, 463–464, 721 N.E.2d 977. Dr. Beech (1) diagnosed respondent's former condition as "Adjustment Disorder," (2) reported that the condition predisposed respondent to engage in misconduct, and (3) predicted that the condition would

have no further ill effects, provided that respondent's law practice is monitored. We therefore accept respondent's disability as an extenuating circumstance.

{¶ 26} Relator also argues that respondent's clients, being of modest means, were among the law's most vulnerable and that this aggravating factor continues to warrant an indefinite suspension. BCGD Proc.Reg. (B)(1)(h). We agree that the harm respondent repeatedly caused these unsophisticated clients warrants a more severe sanction than the board recommended. We therefore reject the recommendation that respondent be credited for the time under suspension that he has already served.

{¶ 27} Accordingly, respondent is hereby suspended from the practice of law in Ohio for two years; however, the second year of this suspension is stayed on the condition that, upon any reinstatement, respondent's client communication and record-keeping practices be overseen by a monitor appointed by relator for two years and in accordance with Gov.Bar R. V(9)(B). If respondent violates this condition, the stay shall be lifted, and respondent shall serve the entire two-year suspension. Costs are taxed to respondent.

Judgment accordingly.

RESNICK, LUNDBERG STRATTON and O'DONNELL, JJ., concur.

MOYER, C.J., F.E. SWEENEY and O'CONNOR, JJ., dissent.

---

**MOYER, C.J., dissenting.**

{¶ 28} I respectfully dissent from the sanction imposed on respondent by the majority. In view of the effect of respondent's violations on his clients and his lack of cooperation in the disciplinary process, I would indefinitely suspend him.

F.E. SWEENEY and O'CONNOR, JJ., concur in the foregoing dissenting opinion.

---

Jerry M. Johnson, for relator.

Craig M. Linnon, pro se.