COLUMBUS BAR ASSOCIATION *v.* PORT.

[Cite as *Columbus Bar Assn. v. Port,*
102 Ohio St.3d 395, 2004-Ohio-3204.]

(No. 2004–0108—Submitted March 15, 2004—Decided July 7, 2004.)

---

**Per Curiam.**

{¶ 1} Respondent, Gregory Darwin Port of Columbus, Ohio, Attorney Registration No. 0043838, was admitted to the practice of law in Ohio in 1990. On May 7, 2003, relator, Columbus Bar Association, charged respondent with four counts of having violated the Code of Professional Responsibility. A panel of the Board of Commissioners on Grievances and Discipline heard the cause and made findings of fact, conclusions of law, and a recommendation.

## Count One

{¶ 2} In 2000, after being referred to respondent by a real estate broker, a client engaged respondent to assist in the sale of her tavern and the transfer of the tavern's liquor license. Respondent received a $20,000 down payment toward the $80,000 purchase price of the tavern that, pursuant to an escrow agreement, he was to hold in trust until the closing or the parties otherwise authorized disbursement. Respondent failed to have his client sign this agreement and, contrary to provisions of the agreement, respondent transferred $19,500 from the escrow account without authority. Respondent paid these funds by a bank check to the real estate broker who had referred the tavern owner as a client.

{¶ 3} At the hearing, respondent admitted that he had no authority to disburse the funds in escrow, a transfer that paid the broker $11,500 over his $8,000 commission. In explanation, respondent told the panel that the broker had brought him "an unbelievable amount of business" and "pressured" him for the money. Respondent also explained, referring to the depression from which he was suffering during this period, that he was "nuts at the time."

{¶ 4} As further evidence of his transgressions, respondent admitted to the panel that although he had received additional payments from the sale of the tavern that were to be deposited in the escrow account, he did not report these receipts to his client, inasmuch as "nobody had asked [him] during that time period to account for anything." Respondent also admitted that he had written checks "from time to time" from his IOLTA account to his law firm's operating account, using those funds to pay office expenses; that he did not keep a trust ledger of his IOLTA account; and that he did not pay attention to the withdrawals and disbursements registered in bank records for that account.

{¶ 5} Respondent's client ultimately hired another lawyer, who repeatedly demanded an accounting from respondent as well as the return of the sale proceeds. When respondent did not comply with these demands, the client, with her new attorney, and the buyer of the bar sued him to recover the missing funds. The client's suit against respondent has since been settled and dismissed.

{¶ 6} The panel found from these facts that respondent had violated DR 1–102(A)(4) (barring conduct involving dishonesty, fraud, deceit, or misrepresentation), 1–102(A)(6) (prohibiting conduct adversely reflecting on an attorney's fitness to practice), 6–101(A)(1) (prohibiting an attorney from accepting employment for which the attorney is not professionally competent), 6–101(A)(3) (prohibiting neglect of an entrusted legal matter), 7–101(A)(1) (requiring an attorney to seek client's lawful objectives), 7–101(A)(3) (prohibiting an attorney from damaging or prejudicing a client during their professional relationship), 9–102(A) (prohibiting commingling of attorney and client funds), 9–102(B)(1) (requiring prompt notification that an attorney has received client's funds), 9–102(B)(3) (requiring an attorney to maintain complete records of client funds and render appropriate accounts), and 9–102(B)(4) (requiring an attorney to promptly deliver funds to which a client is entitled).

## Count Two

{¶ 7} After the Count One client filed a grievance, respondent repeatedly ignored relator's requests for information during the investigation of this misconduct. Respondent ultimately supplied the requested information, but the investigation was significantly delayed due to respondent's early failures to respond. The panel found that respondent had thereby violated Gov.Bar R. V(4)(G) (requiring an attorney's assistance in a disciplinary investigation) and DR 1–102(A)(5) (barring conduct prejudicial to the administration of justice).

## Count Three

{¶ 8} Another client retained respondent to represent her in a personal injury claim arising from the client's August 1998 fall in a department store. Respondent notified the store's insurance carrier that he was representing the client and,

without requesting any discovery, negotiated a settlement in early May 2002, just a few days before the scheduled trial date. The parties settled the client's claim for $25,000, an amount somewhat higher than respondent's client had initially agreed to accept. On May 7, 2002, the attorney for the department store sent the settlement check directly to respondent even though she had not yet received written confirmation of the agreement. At the hearing, the attorney told the panel that she had acted quickly, although she later regretted having been so accommodating, because respondent had been "almost screaming or yelling" on the telephone at her about where the check was.

{¶ 9} Respondent's client was desperate for money and had expected to be compensated soon after the settlement date; however, respondent did not immediately notify her that he had received the settlement check. The client called respondent repeatedly about the settlement proceeds, finally reaching him on June 2, 2002. At that time, respondent told his client that he did not have the check and that she just had to be patient. At the hearing, the client testified that following their telephone call, she had "cried for about two hours." The next morning, the client called the department store's insurance company and learned that the settlement check had been sent to respondent the month before.

{¶ 10} Despite what he told his client on June 2, respondent had not only received the settlement check, he had also endorsed the check for the client without her knowledge and deposited it in his IOLTA account. The client did not receive any portion of the settlement proceeds until she met with respondent on July 1, 2002. On that day, the client signed a settlement agreement providing for respondent's receipt of $8,333.33 in legal fees and accepted a check for the balance of the settlement. According to her panel testimony, the client acquiesced in this arrangement because she was afraid that it was the only way she would get any money.

{¶ 11} After receipt, the client immediately attempted to cash the settlement check. She quickly discovered that the check could not be honored due to insufficient funds, and more than a week passed before she was able to get her money. At the hearing, respondent was asked why he had waited a full two months before giving his client her share of the settlement proceeds. He replied, "why didn't I pay her the money? Well, the main reason was that the money was not in the IOLTA account, but the other complicating factor was that I was still just out of my mind, trying to get my life back together and all my matters just really didn't get taken care of."

{¶ 12} Respondent also compromised this client's efforts to declare bankruptcy. During the period that respondent represented her in the personal injury case, the client retained another attorney to file a bankruptcy petition on her behalf. The bankruptcy attorney was unable, despite repeated attempts, to get any

information from respondent about the client's personal injury claim. As a result, the bankruptcy attorney checked area courts for any record of the personal injury claim and, because respondent did not file it until later, the attorney found nothing. Thus, in the petition she filed on June 19, 2000, the bankruptcy attorney did not list the personal injury action. The client was discharged in bankruptcy in January 2001, but according to the bankruptcy trustee, the client's discharge might have to be revoked because of the undisclosed personal injury claim she had when she filed her bankruptcy petition.

{¶ 13} The panel found on these facts that respondent had violated DR 1–102(A)(4), 1–102(A)(6), 6–101(A)(3), 7–101(A)(1), 7–101(A)(3), 7–102(A)(7) (barring an attorney from assisting a client to act illegally or fraudulently), 9–102(A), 9–102(B)(1), 9–102(B)(3), and 9–102(B)(4).

## Count Four

{¶ 14} In 1999, respondent represented a third client, who was sued by a tenant seeking the return of a security deposit. Respondent filed an answer and counterclaim on his client's behalf, charging that the tenant had damaged the property.

{¶ 15} Respondent never responded to interrogatories propounded during discovery by the tenant's attorney. Eventually, the court entered a default judgment against respondent's client on the tenant's counterclaim because respondent had not, even after a court order, complied with the tenant's discovery requests. The court awarded damages and also ordered respondent and his client to pay legal fees and expenses as sanctions, a judgment that grew, with interest, to $10,173.63. In the meantime, the Franklin County Court of Appeals affirmed the judgment against respondent and his client, in part because respondent had not filed a transcript of the trial court proceedings.

{¶ 16} Respondent freely admitted his neglect of this client's interests and told the client, who ultimately paid the judgment in full, that he "would take care of" the judgment against her. Around April 1, 2003, after his client had filed her grievance with relator, respondent gave the client a $12,000 promissory note and a check in the amount of $1,000 as a first partial payment on the debt. The check bounced. Not until later that month did respondent actually remit the first installment. Respondent was apparently also late with the second installment and, as of the panel hearing on July 31, 2003, he had not paid either the June or July 2003 installments. Respondent, who did not immediately disclose to this client his lack of malpractice insurance, also executed a third mortgage on his house to the client that he claimed secured the debt.

{¶ 17} The panel found from these facts that respondent had violated DR 1–102(A)(5), 1–102(A)(6), 1–104 (requiring an attorney to disclose insufficient mal-

practice insurance), 6–101(A)(1), 6–101(A)(2) (requiring adequate preparation in a legal matter), 6–101(A)(3), 7–101(A)(1), 7–101(A)(2) (requiring an attorney to carry out a contract for employment), 7–101(A)(3), 9–102(B)(1), 9–102(B)(3), and 9–102(B)(4).

## Sanction

{¶ 18} In recommending a sanction for respondent's misconduct, the panel considered the aggravating and mitigating elements of respondent's case. See Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). Relator argued to the panel that respondent's case presented "overwhelming evidence of multiple instances of serious misconduct over a lengthy period and the lack of any substantial mitigating behavior." Relator recommended that respondent be indefinitely suspended from the practice of law.

{¶ 19} After admitting nearly all of the misconduct charged against him, respondent described how he had plunged into a deep depression and alcohol abuse culminating in an attempted suicide on December 13, 2001. In mitigation of his misconduct, respondent recounted:

{¶ 20} "I've seen the gates of hell. * * * [N]ever in my life did I expect to ever be before a panel of distinguished judges explaining myself as to misdeeds against the Supreme Court rules. I have committed misdeeds. I have admitted them * * * many times.

{¶ 21} "My practice took off in the mid '90s. I took cases nobody else wanted. When lawyers had cases that were too messy, too small, they didn't want, they gave them to me. And I had a pretty good practice.

{¶ 22} "The pressure became overwhelming, the litigation, the contracts, the divorce disputes, the clients calling all hours of the day wanting things done, and I developed an alcohol problem. The alcohol problem or heredity, for whatever reason, I also suffered from depression, severe depression. It all manifested itself in a suicide attempt, December of 2001."

{¶ 23} The panel found compelling the corroborating testimony of respondent's wife, who described the drastic changes in respondent's behavior that had taken place in 2001. He was sick in bed much of the time, drank heavily, and no longer conscientiously answered telephone calls when he did go to work. Also in 2001, respondent had immersed himself in volunteer activities in what his wife thought was an escape from dealing with the overwhelming financial problems and other responsibilities of his practice.

{¶ 24} After his suicide attempt, respondent was hospitalized for four days. Upon his release, respondent intermittently saw a psychiatrist and psychologist and was treated with medication. Respondent was not satisfied with his progress

under medical care, and during July 2002, he had what appeared to his wife to be a significant relapse. At that time, respondent and his wife discussed taking a different approach. Respondent's wife testified, answering respondent's questions:

{¶ 25} "And we just kind of finally sat down together and decided that we had to come to terms with this, that the past two and a half years had been living a nightmare, like nothing we'd ever known, and we wanted to get back to the way things were. So you became very dedicated in talking to people and reading about depression and finding out everything that could be done aside from medication to try to alleviate it, and exercising regularly and talking more openly with me about things that had gone on and were going on in your business and not trying to handle all of that yourself. And the last year has been remarkable."

{¶ 26} Respondent's wife also described how he had stopped drinking completely, which at the time of the panel hearing had been for 13 months. In the meantime, she said, respondent had returned to being the responsible, sober, ethical, trustworthy, and honest person he used to be. In response to questions by panel members, respondent's wife acknowledged that his recovery efforts had been undertaken without much medical supervision but explained that this was due, in part, to their family's distressed financial situation. She assured the panel that she and respondent were receptive to any assistance medical professionals could provide. In closing argument to the panel, respondent presented heartfelt statements about his devotion to his wife and children and family, and assured the panel that whatever resulted from the disciplinary proceedings, he would sustain his recovery because of his family.

{¶ 27} The panel recommended that respondent's license to practice law be suspended for a term of two years, with the second year stayed, subject to the conditions (1) that during at least the first year of the suspension, respondent actively participate in the Lawyers Support System of the Ohio Lawyers Assistance Program ("OLAP"); (2) that during at least the first year of the suspension, respondent submit to a counseling and treatment program recommended by a licensed health care professional to manage his depression; (3) that during at least the first year of the suspension, respondent properly administer medications as prescribed; and (4) that before filing any petition for reinstatement to the practice of law, respondent present evidence to relator that he has met all of the foregoing conditions.

{¶ 28} The board adopted the panel's findings of misconduct and found an additional violation of DR 5-107(B) (prohibiting an attorney from accepting direction from a person who referred the client) as to Count One. Consistent with relator's suggestion, however, the board recommended that respondent's law license be indefinitely suspended. With this recommendation, the board sought

to allow respondent, with the assistance of OLAP or a similar program, to obtain a mental illness professional's diagnosis of his medical condition, undergo successful medical treatment, and receive a prognosis demonstrating his ability to return to the ethical and competent practice of law. See BCGD Proc.Reg. 10(B)(2)(G).

{¶ 29} Upon review, we agree that respondent violated DR 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), 1–104, 5–107(B), 6–101(A)(1), 6–101(A)(2); 6–101(A)(3), 7–101(A)(1), 7–101(A)(2), 7–101(A)(3), 7–102(A)(7), 9–102(A), 9–102(B)(1), 9–102(B)(3), and 9–102(B)(4) and Gov.Bar R. V(4)(G), as found by the board. Respondent repeatedly neglected entrusted legal matters, deceived his clients, and failed to cooperate in the investigation of his misconduct. This combination of misconduct warrants an indefinite suspension of respondent's law license. *Cleveland Bar Assn. v. Clavner*, 99 Ohio St.3d 53, 2003-Ohio-2464, 788 N.E.2d 1065; *Disciplinary Counsel v. Golden*, 97 Ohio St.3d 230, 2002-Ohio-5934, 778 N.E.2d 564. In fact, respondent's misappropriation of a client's funds, in the absence of any extenuating circumstance, is cause for his disbarment. *Cleveland Bar Assn. v. Dixon*, 95 Ohio St.3d 490, 2002-Ohio-2490, 769 N.E.2d 816.

{¶ 30} The board, however, was obviously moved by the lay testimony suggesting that respondent has suffered from mental disability from which he seems capable of recovery. This evidence does not establish the mitigating effect of respondent's disability to the extent specified in BCGD Proc.Reg. 10(B)(2)(g)(i) through (iv), which requires a professional diagnosis of the attorney's condition, proof that the condition contributed to the misconduct, proof that the condition has been treated with success, and a professional prognosis for the attorney's competent and ethical return to the practice of law. However, on the chance that respondent might, in time, regain the capacity to practice law in accordance with the standards of this profession, we accept the board's recommendation to indefinitely suspend him.

{¶ 31} Accordingly, respondent is hereby indefinitely suspended from the practice of law in Ohio. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

---

Michael J. Hardesty, Barbara J. Petrella, Bruce A. Campbell, Bar Counsel, and Jill M. Snitcher McQuain, Assistant Bar Counsel, for relator.

Gregory Darwin Port, pro se.