COLUMBUS BAR ASSOCIATION *v.* WINKFIELD.

[Cite as *Columbus Bar Assn. v. Winkfield,*
107 Ohio St.3d 360, 2006-Ohio-6.]

(No. 2005–1115—Submitted August 23, 2005—Decided January 11, 2006.)

## Per Curiam.

{¶ 1} Respondent, Lawrence Edward Winkfield of Westerville, Ohio, Attorney Registration No. 0034254, was admitted to the practice of law in Ohio in 1975.

{¶ 2} Respondent was first disciplined for professional misconduct in 1996 when we suspended him from the practice of law for one year but conditionally stayed the suspension. See *Columbus Bar Assn. v. Winkfield* (1996), 75 Ohio St.3d 527, 664 N.E.2d 902. On April 11, 2001, we found additional misconduct and ordered another suspension of respondent's license, this time for two years with a stay of the last year on the condition of restitution. See *Columbus Bar Assn. v. Winkfield* (2001), 91 Ohio St.3d 364, 745 N.E.2d 411. To implement his suspension, we directed respondent to "deliver to all clients being represented in pending matters all papers or other property pertaining to the client * * *, calling attention to any urgency for obtaining such papers or property." Respondent did not make restitution and has not been reinstated.

{¶ 3} On January 15, 2003, relator, Columbus Bar Association, filed a ten-count amended complaint charging respondent with additional misconduct, including his continued practice of law in violation of our April 11, 2001 order. A panel of the Board of Commissioners on Grievances and Discipline heard the cause and made findings of fact, conclusions of law, and a recommendation, all of which the board adopted.

## Misconduct

{¶ 4} Respondent stipulated to the facts and misconduct charged in Counts I through VIII and X of the complaint, and relator withdrew Count IX.

### Count I

{¶ 5} In February 2001, respondent agreed to represent Paul Hart in a divorce case. Respondent did not tell Hart of his suspension so that Hart could retain new counsel for an upcoming hearing, scheduled for May 1, 2001. Hart's wife discovered the suspension and told Hart, and Hart confronted respondent about his professional status. Respondent replied that despite the suspension of his license to practice, he could continue to represent Hart through a "ghost attorney."

{¶ 6} Hart retained other counsel on April 13, 2001, and his new counsel immediately requested Hart's case file from respondent. Despite repeated

requests, respondent did not mail the Hart file to his successor counsel until May 3, 2001, two days after the scheduled hearing. Later, in a May 14, 2001 letter to relator, respondent misrepresented his actions in delivering Hart's file.

{¶ 7} The board found that respondent had thereby violated our order suspending his license and also violated DR 1–102(A)(4) (prohibiting conduct involving fraud, deceit, dishonesty, or misrepresentation), 1–102(A)(5) (prohibiting conduct prejudicial to the administration of justice), 1–102(A)(6) (prohibiting conduct adversely reflecting on fitness to practice law), 7–101(A)(3) (prohibiting a lawyer from causing a client damage or prejudice), and 9–102(B)(4) (requiring a lawyer to promptly deliver funds a client is entitled to receive).

## Count II

{¶ 8} On or about May 5, 2001, while his law license was still suspended, respondent accepted a fee from Cynthia Ann Randle to prepare a deed to transfer real property. Respondent later prepared the deed and oversaw execution of the document. He also notarized signatures on the deed despite the fact that his authority as a notary public was contingent on his licensed authority to practice law.

{¶ 9} On or about June 21, 2001, respondent offered to complete for Randle the administration of her deceased father's estate. Respondent advised his client that another attorney would help him with the case. He did not tell Randle that he had been suspended from the practice of law, referring to himself instead as a "case manager/paralegal" on business cards and stationery.

{¶ 10} Respondent met with Randle after directing her to collect papers concerning the estate. Respondent advised that he would seek a continuance of an upcoming July 12, 2001 hearing on a contempt citation against Randle. He also said that Randle's brother, who had also been cited, need not attend. The contempt hearing went forward as scheduled, but respondent never told the brother to appear, and the brother did not. When Randle told the probate court why her brother had not appeared, the court continued the case and notified relator of respondent's conduct.

{¶ 11} The board found that respondent had thereby violated our order suspending his license and also violated DR 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), and 3–101(B) (prohibiting practicing law in a jurisdiction in violation of the rules of that jurisdiction).

## Count III

{¶ 12} Respondent also represented Dreama Slappy, a fiduciary in a probate court estate. Before his April 11, 2001 suspension, respondent failed to have his client file an estate-status letter and account on the date due. After the

suspension, respondent failed to tell his client that she needed to obtain new legal counsel. He instead assured her that he was acting as her "case manager" and taking care of the estate.

{¶ 13} Slappy was cited to appear in the probate court on July 26, 2001, regarding her failure to file estate papers. Slappy consulted respondent about the citation, and respondent prepared a "Status Letter" for her to sign and take to the court hearing. Slappy presented the letter unsigned to the magistrate at the hearing.

{¶ 14} The board found that respondent had thereby violated our order suspending his license and also violated DR 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), 3–101(B), and 7–101(A)(3).

## Count IV

{¶ 15} Just prior to his April 11, 2001 suspension and despite his knowledge of the board's recommendation to indefinitely suspend him, respondent accepted Janine Lovelace's personal-injury case. He did not tell Lovelace of the pending disciplinary proceedings and described himself at a meeting in May 2001 as Lovelace's attorney. In July 2001, respondent faxed to Lovelace a contingent-fee agreement for her signature.

{¶ 16} On or about October 16, 2001, Lovelace learned from respondent's secretary that he had been suspended from practicing law, that he had arranged for another lawyer named Leo Ross to represent her, and that Ross was seeking a settlement of her claim. In the next day or so, respondent explained to Lovelace that he had forgotten to tell her about his suspension. Lovelace later decided to have Ross represent her, and he eventually secured a settlement.

{¶ 17} The board found that respondent had thereby violated our order suspending his license and also violated DR 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), and 3–101(B).

## Count V

{¶ 18} Sanita MacLean employed attorney Clifford Farrell to represent her in a personal-injury matter arising out of an accident that occurred on May 31, 2001. Upon investigating the case, Farrell discovered that respondent had met with MacLean after her accident and had given her a fee agreement and other documents concerning his representation of her in regard to the accident. On some documents, respondent had signed the name of another lawyer whom MacLean had never met.

{¶ 19} Farrell also learned of a letter that was sent in June 2001 to the insurance company for the party at fault in MacLean's accident. The letter advised of MacLean's personal injury and property damage and bore a signature

purporting to belong to "Leo Ross, Esq." Respondent's name also appeared on the letterhead as Ross's "Case Manager/Paralegal." Thereafter, Farrell twice attempted to secure from respondent any papers that MacLean had signed during their association. Farrell had no success.

{¶ 20} The board found that respondent had thereby violated our order suspending his license and also violated DR 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), and 3–101(B).

### Count VI

{¶ 21} In January 2001, Pamela Taylor paid respondent approximately $750 to collect a debt in excess of $9,000. Respondent filed suit on Taylor's behalf in the Franklin County Municipal Court, Small Claims Division, which had jurisdiction to award a maximum of $3,000. Moreover, respondent did not obtain service on the defendant until the day before a scheduled hearing, and the court canceled the hearing.

{¶ 22} Taylor did not hear from respondent again until he called to say that he had been suspended from practice and that Leo Ross would be handling her case. When Taylor contacted Ross, he responded in writing that he knew nothing of her case and did not represent her. Respondent later told Taylor that she would be represented by another lawyer, whom she had never met.

{¶ 23} Taylor filed a grievance against respondent and demanded the return of her case file and fees. Respondent replied that he would return the case file if Taylor agreed to withdraw her grievance. Taylor refused, but respondent eventually honored his duty to return her property. Taylor then obtained new counsel, who filed her case in a court having appropriate jurisdiction.

{¶ 24} To investigate Taylor's grievance, relator sent three letters of inquiry to respondent's last known addresses, two to an office address and the last to a residence. The third letter was apparently received, so relator sent a certified letter to the residence address on March 5, 2002. This letter was returned "unclaimed." Finally, on March 29, 2002, relator sent a notice of intent to file a formal complaint to respondent's residence by certified mail, regular mail, and hand delivery. Despite these efforts, respondent never responded to Taylor's grievance.

{¶ 25} The board found that respondent had thereby violated DR 1–102(A)(5), 1–102(A)(6), 2–110(A)(2) (requiring a lawyer to take reasonable steps to prevent damage or prejudice to a client before withdrawing from representation), 2–110(A)(3) (requiring a lawyer to refund unearned fees upon withdrawal), 6–101(A)(3) (prohibiting the neglect of an entrusted legal matter), 7–101(A)(1) (requiring a lawyer to seek a client's lawful objectives), 7–101(A)(2) (prohibiting a lawyer from intentionally failing to complete a contract for professional employ-

ment), 7–101(A)(3), and 9–102(B)(4) (requiring a lawyer to promptly return property a client is entitled to receive), and Gov.Bar R. V(4)(G) (requiring a lawyer to cooperate in disciplinary proceedings).

## Count VII

{¶ 26} In July 2000, a client retained respondent to represent her in a divorce, paying him $750 in installments. When his client's husband began removing their children from school without her consent, respondent failed to write a letter she requested to admonish the school about the problem. The client ultimately wrote her own letter and resolved the situation.

{¶ 27} After the divorce was final, respondent promised to prepare and file the qualified domestic relations order ("QDRO") under which his client would be entitled to a share of her ex-husband's retirement benefits. Respondent did not file the QDRO, and his client's ex-husband withdrew some of the funds, depriving the client of money to which she was entitled.

{¶ 28} Also during this representation, respondent made repeated, unwelcome sexual overtures toward his client, including requests for sexual acts.

{¶ 29} The board found that respondent had thereby violated DR 1–102(A)(3) (prohibiting a lawyer from engaging in illegal acts involving moral turpitude), 1–102(A)(6), 1–102(B) (prohibiting a lawyer from engaging in discriminatory conduct while acting in a professional capacity), 5–101(A) (prohibiting a lawyer from accepting employment when the lawyer's professional judgment on his client's behalf may be compromised by the lawyer's personal interests), 6–101(A)(3), 7–101(A)(1), 7–101(A)(2), and 7–101(A)(3).

## Count VIII

{¶ 30} Bradley Williams retained respondent in January 2001 to represent him in a personal-injury action arising out of an automobile accident. Respondent advised Williams to reject an initial settlement offer but afterward did not speak to his client again despite Williams's attempts to contact him. Respondent never told Williams about his April 2001 suspension and turned Williams's case over to another attorney without his client's knowledge. Respondent also did not deliver Williams's case file. In the meantime, Williams began receiving notices of past-due medical bills arising from the accident.

{¶ 31} Williams filed a grievance in April 2002, and relator asked respondent for a written reply. Respondent finally responded on July 29, 2002.

{¶ 32} The board found that respondent had thereby violated our order suspending his license and also violated DR 1–102(A)(5), 1–102(A)(6), 2–110(A)(2), 6–101(A)(3), 7–101(A)(1), 7–101(A)(2), 7–101(A)(3), and 9–102(B)(4), and Gov.Bar R. V(4)(G).

## Count X

{¶ 33} While his license to practice law was suspended, respondent routinely held himself out as an attorney and continued to represent various clients. He charged clients for legal services that he was not authorized to provide and usually did not perform. Respondent has also routinely misappropriated client funds from his trust account for his personal use.

{¶ 34} The board found that respondent had thereby violated our order suspending his license and also violated DR 1–102(A)(6), 2–106(A) (prohibiting a lawyer from charging a clearly excessive or otherwise illegal fee), 3–101(B), and 9–102(A) (requiring a lawyer to preserve the identity of client property in a separate and identifiable trust account).

## Sanction

{¶ 35} The parties jointly suggested an indefinite suspension of respondent's license with no credit to be applied for any period of suspension already served. The panel and board accepted this suggestion, citing respondent's history of mental impairment and extremely difficult upbringing. The panel and board also relied heavily on bar counsel's solicited personal opinion that respondent was worthy of another chance to practice law. The panel and board thus recommended that respondent's license to practice be indefinitely suspended and, consistent with the parties' proposals, that he complete the following conditions, in addition to those of Gov.Bar R. V(10), prior to filing any application for reinstatement:

{¶ 36} 1. Complete the restitution ordered in *Columbus Bar Assn. v. Winkfield* (2001), 91 Ohio St.3d 364, 745 N.E.2d 411;

{¶ 37} 2. Discharge expeditiously any obligations to the Client Security Fund and debts owed to former clients as a result of his misconduct;

{¶ 38} 3. Refrain from the unauthorized practice of law;

{¶ 39} 4. Enter into and comply with a comprehensive and professionally prescribed mental and physical health treatment plan for the medical conditions that have affected his practice of law;

{¶ 40} 5. Present quarterly reports to relator regarding his compliance with the health treatment plan;

{¶ 41} 6. Present clear and convincing medical evidence of his physical and mental ability to ethically engage in the practice of law; and

{¶ 42} 7. Establish a detailed oversight plan, to include monitoring, for any postsuspension practice of law.

Review

{¶ 43} On review, we agree that respondent violated the suspension order in *Columbus Bar Assn. v. Winkfield* (2001), 91 Ohio St.3d 364, 745 N.E.2d 411, and that he also violated DR 1–102(A)(3), 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), 1–102(B), 2–106(A), 2–110(A)(2), 2–110(A)(3), 3–101(B), 5–101(A), 6–101(A)(3), 7–101(A)(1), 7–101(A)(2), 7–101(A)(3), 9–102(A), and 9–102(B)(4), and Gov.Bar R. V(4)(G), as found by the board. We also agree that an indefinite suspension is appropriate.

{¶ 44} To determine the appropriate sanction, we weigh the professional duties violated by the offending lawyer, the lawyer's mental state, the actual injury caused by the misconduct, the mitigating and aggravating circumstances of the case, and sanctions imposed in similar cases. *Disciplinary Counsel v. Connors*, 97 Ohio St.3d 479, 2002-Ohio-6722, 780 N.E.2d 567, ¶ 16; *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818. In view of the scale and severity of respondent's malfeasance and his prior disciplinary record, the board properly determined that it had only two choices—to recommend indefinite suspension of respondent's license to practice law or disbarment.

{¶ 45} Disbarment is generally the sanction when a lawyer's neglect of client cases is coupled with misappropriation of the client's money and other Disciplinary Rule violations. *Cleveland Bar Assn. v. Glatki* (2000), 88 Ohio St.3d 381, 384, 726 N.E.2d 993. This is especially true when the lawyer has a history of misconduct, *Cuyahoga Cty. Bar Assn. v. Aldrich*, 104 Ohio St.3d 159, 2004-Ohio-6407, 818 N.E.2d 1173, and has flagrantly violated an ordered suspension of his license to practice law, *Disciplinary Counsel v. Watson*, 107 Ohio St.3d 182, 2005-Ohio-6178, 837 N.E.2d 764..

{¶ 46} Relator, however, has not advocated disbarment, nor has the board recommended it. Both were influenced by the seriousness of respondent's mental disease and the professional and personal hardships it has caused.

{¶ 47} Pursuant to Gov.Bar R. V(7)(C), the board asked respondent to submit to a psychiatric evaluation. Psychiatrist Ronald Litvak, M.D., conducted the exam and reported respondent's 15–year history with depression and a personality disorder that has required at least one hospitalization. During this time, respondent has been treated by several different psychiatrists and his family doctor and has been prescribed various antidepressants.

{¶ 48} Since 1997, respondent has also been in counseling with Richard John Fetter, a licensed independent social worker. As part of his diagnosis, Fetter listed a variety of conditions that respondent manifests, including depression and attention-deficit disorder. Fetter agreed with Litvak, however, that respondent suffers from "long-standing personality disorder not otherwise specified," a

diagnosis that encompasses the behaviors Fetter found and that is potentially very debilitating.

{¶ 49} Litvak and Fetter also agreed that respondent's difficulties stemmed from his traumatic experiences as a child with adult abandonment. Respondent lived with an aunt in New Jersey until he was two years old. When his mother died, respondent was shuttled to North Carolina to live with a great-aunt. His great-aunt died suddenly when he was eight years old, and he was moved back to New Jersey to live first with a great-uncle and then again with his aunt. When he was in seventh grade, respondent was given to the foster parents whom he would eventually think of as his mother and father. He lived with 11 others in his foster parents' three-bedroom house until he graduated from high school.

{¶ 50} Fetter described respondent's childhood, adolescence, and experiences as an adult for the panel:

{¶ 51} "His childhood and adolescence was marked by chaos, insecurity, helplessness, feelings of abandonment, mistrust, betrayal and the absence of a practical blueprint for decision making, problem solving and structuring his life. Despite these deficits, Mr. Winkfield's intellectual abilities, self-determination and self centeredness helped him become successful academically and he was able to enter adulthood with great opportunity to become a lawyer."

{¶ 52} Fetter and Litvak also agreed that respondent continues to show signs of illness that currently preclude his competent and ethical practice of law. Fetter described respondent's reaction to life as "doing the best he can" despite being pathologically unable to accept responsibility for his negative behavior or the mistakes he has made personally and professionally. In fact, on the global-assessment-of-functioning scale, Fetter gauged respondent's level of functioning at 60 to 65 out of 100, an indicator of serious impairment in social and occupational functioning. Fetter also advised the panel and board that respondent's mental condition contributed to his professional problems and compromised his family life.

{¶ 53} The panel and board found most compelling the testimony of respondent's foster mother, Jean Marie Greene. Greene testified that she and her husband, a pastor, had taken respondent in to provide the male supervision he would not otherwise have received. Greene implored the panel not to "discard" respondent, explaining that he had been poorly served by adults as a child and had struggled with that rejection. Greene described respondent as a capable person who had stopped short of his potential. She asked that he be given one more chance to recover and possibly return someday to practicing law.

{¶ 54} In *Columbus Bar Assn. v. Port*, 102 Ohio St.3d 395, 2004-Ohio-3204, 811 N.E.2d 535, another lawyer committed serial and serious misconduct, including repeated neglect, misappropriation, and failure to cooperate in the disciplinary

proceedings. The board recommended an indefinite suspension, even though the misappropriation alone was cause for disbarment. The board made this recommendation based in part on lay testimony of the lawyer and his wife about the lawyer's mental disability and how they were attempting to treat his condition.

{¶ 55} We accepted the board's recommendation in *Port* despite the fact that no medical evidence satisfied Section 10(B)(2)(g) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). BCGD Proc.Reg. 10(B)(2)(g)(i) through (iv) require for mitigating effect (i) a professional diagnosis of the lawyer's mental disability, (ii) proof that the disability contributed to the misconduct, (iii) proof that the disability has been treated with success, and (iv) a professional prognosis for the lawyer's ability to return to the competent and ethical practice of law. In place of this evidence, the witnesses in *Port* earnestly portrayed the lawyer's bouts with depression and alcohol abuse and his commitment, albeit with inadequate assistance from medical professionals, to recovery. We inferred from this testimony that the lawyer might be able to establish qualifications to again practice law at some point in the future.

{¶ 56} Here, respondent presented proof of a diagnosed mental disability and the causal connection between his diagnosis and misconduct. Whether respondent can be successfully treated for his personality disorder to the extent necessary to practice law is less clear; however, Fetter reported significant improvement in the last year or so and is optimistic that respondent will continue to improve. We are thus persuaded to also give respondent the chance to prove himself in the future, albeit under the rigorous conditions recommended by the board.

{¶ 57} Respondent is therefore indefinitely suspended from the practice of law in Ohio. Upon any petition for reinstatement, respondent must show compliance with Gov.Bar R. V(10) and show the following:

{¶ 58} 1. He has made restitution as ordered in *Columbus Bar Assn. v. Winkfield* (2001), 91 Ohio St.3d 364, 745 N.E.2d 411;

{¶ 59} 2. He has satisfied all financial obligations to the Client Security Fund and debts to former clients incurred because of his misconduct;

{¶ 60} 3. He has not been accused of engaging in the unauthorized practice of law;

{¶ 61} 4. Within 30 days of our judgment, he has entered into and consistently complied with a comprehensive and professionally prescribed health-treatment plan for the mental conditions at issue in this case;

{¶ 62} 5. During the treatment, he has provided quarterly reports to relator regarding his compliance with the health-treatment plan;

{¶ 63} 6. He is physically and mentally able to competently and ethically engage in the practice of law; and

{¶ 64} 7. He has a detailed oversight plan for his postsuspension practice of law that includes a structured environment and monitoring.

{¶ 65} Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

---

Bruce A. Campbell, Bar Counsel, Jill Snitcher–McQuain, Assistant Bar Counsel, and Judith M. McInturff and Fred Thomas, for relator.

James A. Hofelich, for respondent.