DISCIPLINARY COUNSEL *v.* HUTCHINS.

[Cite as *Disciplinary Counsel v. Hutchins,*
102 Ohio St.3d 97, 2004-Ohio-1805.]

(No. 2003–1196—Submitted December 16, 2003—Decided April 28, 2004.)

**Per Curiam.**

{¶ 1} Respondent, A. Robert Hutchins of Columbus, Ohio, Attorney Registration No. 0015775, was admitted to the practice of law in Ohio in 1985. On August 12, 2002, relator, Disciplinary Counsel, charged respondent in a two-count complaint with various violations of the Code of Professional Responsibility. A panel of the Board of Commissioners on Grievances and Discipline of the Supreme Court heard the cause and, based on stipulations and other evidence, made findings of fact, conclusions of law, and a recommendation.[1]

{¶ 2} With respect to the first count of misconduct, evidence established that on October 30, 2001, respondent filed a divorce action on behalf of a client in the Franklin County Court of Common Pleas, Domestic Relations Division. The client's husband, who was represented by Cynthia Roy, eventually counterclaimed.

{¶ 3} The domestic relations court issued a temporary restraining order ("TRO") on October 30, 2001, in part, to prevent the client's husband from

1. The parties agreed to review by only two of the three panel members appointed to hear the cause.

disposing of the couple's marital property. Pursuant to court procedure, the court's original order bearing the duty magistrate's *actual* signature was time-stamped and filed with the Franklin County Clerk of Courts on the date of issue. Also pursuant to procedure, the duty bailiff provided respondent a copy of the TRO bearing the duty magistrate's *stamped* signature and the clerk of court's certification, dated October 30, 2001.

{¶ 4} Thereafter, respondent and Roy continued to negotiate the terms of their clients' divorce until April 3, 2002, when a final divorce decree was entered by agreement. Respondent's client and her husband jointly owned a house for which respondent's client was the sole mortgagee. When her husband vacated this property, respondent's client, concerned about her obligations under the mortgage, wanted to sell. On respondent's advice, the client presented the house in September 2001 as "For Sale by Owner." The client's husband later agreed to cooperate in the sale, and on October 24, 2001, the couple signed a contract to list the property with a real estate broker.

{¶ 5} A purchaser made an offer to buy the house in response to the "For Sale by Owner" sign, and the client and her husband accepted the offer. As part of the attorneys' efforts to settle issues concerning their clients' interests in any proceeds from the sale, respondent, Roy, and their clients met several days before the scheduled November 28, 2001 closing. Respondent provided for Roy's review an itemized list of projected closing-related costs to be deducted from the sale price, which he anticipated to produce $2,785.27 in proceeds. He also provided an itemized list of the $3,359.76 in expenses that his client had personally incurred in putting the house up for sale and for which he wanted his client reimbursed. These lists indicated that the sale would still result in a deficit of $574.49, half of which respondent advised Roy that he wanted her client to pay.

{¶ 6} Respondent incorporated the itemized lists into a draft Agreed Magistrate's Order that he also supplied for Roy's review. Because he included a provision in the draft entry that Roy's client pay half of the identified deficit, Roy struck that line from the draft. Roy then returned the draft entry to respondent, advising that the entry was otherwise acceptable. In light of what seemed to be their agreement, Roy reported to the magistrate assigned to the case that a status conference concerning certain motions, also scheduled for November 28, 2001, was unnecessary.

{¶ 7} Respondent thereafter engaged in the conduct underlying the first count of the complaint. In the days before the closing, respondent and an employee acting at his direction "created" a new Agreed Magistrate's Order by "cutting and pasting" parts of the October 30, 2001 TRO that respondent had received at the commencement of the divorce proceedings. According to relator's and respondent's stipulations, "[a] photocopy of the rubber-stamped signature" of the

duty magistrate was "cut-out and affixed to the entry in addition to a signature purporting to be that of Attorney Roy, along with a clerk's certification dated October 30, 2001 and a heading bearing a 'filing date' of October 30, 2001." In addition to the terms with which Roy had previously agreed, the new "Agreed Magistrate's Order" provided that respondent's client would "take possession of any funds distributed at closing, pay all debts associated with the sale as agreed to, and hold [the husband] harmless thereon."

{¶ 8} Roy testified before the panel that she did not agree to this "distribution of funds" provision, inasmuch as she understood that there would be no proceeds to distribute at the closing. Roy also testified that she did not authorize her signature on the new Agreed Magistrate's Order. Moreover, while Roy ultimately learned of the new order created by respondent, she testified that respondent did not provide her a copy of the new order before the November 28, 2001 closing.

{¶ 9} During the evening of November 27, 2001, respondent caused the new Agreed Magistrate's Order created in his office to be transmitted by facsimile to the title company that was participating in the closing the next day. The title company's escrow officer testified that prior to receiving this document she had discussions with respondent and his client in which she had been asked to arrange for the client to receive the entire proceeds of the sale.[2] The escrow officer had explained that she could not include in the closing settlement statement the client's costs in selling the house "by owner" and deduct those expenses from the husband's share of the proceeds. Moreover, because the client's husband, as co-owner, was entitled to half the proceeds, the escrow officer advised respondent that she could not disburse all of the proceeds to respondent's client without the divorcing couple's joint agreement or a court order to this effect. Respondent assured the escrow officer that he "had a document authorizing all the money to go to [his client]."

{¶ 10} On the morning of November 28, 2001, the escrow officer reviewed the fabricated Agreed Magistrate's Order that respondent had sent to the title company. Convinced that it was legitimate, the escrow officer arranged for the closing payoff in accordance with the fabricated order. She also prepared a separate statement for the couple's signatures to confirm that the couple intended for the sale proceeds to be disbursed to respondent's client. During the closing, a meeting that Roy did not attend, the husband signed this agreement, although

---

2. Also at this time, respondent had discussed with the escrow officer his desire to be paid $3,650, an amount to which he referred intermittently during these events as his 2.5 percent "commission" for assisting with the sale or as his "attorney's fees" for the same service. The propriety of this payment is the subject of the second count of misconduct.

he had not anticipated any proceeds from the sale or that he would have to relinquish his share.

{¶ 11} Respondent's client consequently received $3,287.05 at the closing. She used proceeds to pay the expenses and fees that she had incurred in the transaction. Her husband received nothing from the sale at that time.

{¶ 12} Roy was out of her office on November 28, 2001, so she did not immediately see an amended account, closing settlement statement, and facsimile cover sheet that respondent had transmitted to her on the previous evening. Instead, Roy learned on November 29, 2001, from another attorney whom her client had asked to look into the matter that respondent's client had received money at the closing. Also from that attorney, Roy received a copy of the fabricated Agreed Magistrate's Order, as well as her client's agreement to the disbursement of proceeds. Several days later, Roy, who continued to represent her client after explaining that she had not known of the events at the closing, filed an ex parte motion to set aside the fabricated Agreed Magistrate's Order. In considering the motion, the magistrate assigned to the divorce case discovered that the fabricated Agreed Magistrate's Order had not been filed in court. The magistrate thereafter reported respondent's conduct to relator.

{¶ 13} From these facts, the panel found clear and convincing proof that respondent had "created a false and misleading judgment entry and transmitted that entry to a title agency for the purpose of facilitating the completion of a real estate transaction." Thus, as to Count One, the panel found that respondent had violated DR 1–102(A)(4) (barring conduct involving dishonesty, fraud, deceit, or misrepresentation), 1–102(A)(5) (barring conduct prejudicial to the administration of justice), 1–102(A)(6) (barring conduct that adversely reflects on an attorney's fitness to practice law), and 7–102(A)(5) (prohibiting a knowingly false statement of law or fact).

{¶ 14} As to Count Two, evidence established that in assisting his client with the sale of the divorcing couple's house, respondent, who is not a licensed real estate broker or agent, sent a letter to his client on or about September 21, 2001. The letter advised the client:

{¶ 15} "While [your husband's] name is not on the mortgage it is on the deed, which means he will have to play a role in the closing, or quitclaim his interest in the property. I will continue to discuss a quitclaim deed with his attorney. In the mean time [sic], you can post a 'For Sale by Owner' sign and we can provide the services you need to secure a buyer, as we discussed our fee for that would be 2.5%. While ours is a flat fee, we may have to pay a commission to a buyer represented by an agent. Your combined commission in that instance should still be less than the 6–7% 'standard' rate. PLEASE NOTE, this will not affect or impact your domestic fees."

{¶ 16} It was after this letter that respondent's client and her husband listed their house and also engaged a listing agent.[3]  In the itemized lists of expenses that respondent had provided to Roy several days before the closing, respondent had included the costs of paying a three percent commission, or $4,380, to the "Buyers Agent," a 2.5 percent commission, or $3,650, to the "Sellers Agent," and $500 in attorney fees.  Roy, who knew that respondent had helped to find a buyer for the divorcing couple's house but also that the couple had listed the property, assumed that these provisions were included to compensate the listing agents engaged by the buyers and sellers and that the $500 in attorney fees was included to compensate respondent for his assistance in the sale.[4]

{¶ 17} As mentioned, Roy did not attend the closing on November 28, 2001, and was also out of her office that day.  However, sometime after the close of business on November 27, 2001, respondent transmitted by facsimile to Roy an "amended account" for closing the next day.  In the amended account, respondent reported the same or updated information from his earlier account, including an updated closing deficit figure of $72.71.  Respondent also identified the $3,650 expense in this account, but this time he designated the expense as "listing sale fees."  Roy reviewed this amended account for the first time on November 29, 2001, the day after the closing and the same day that she was contacted by the new attorney her client had retained.

{¶ 18} Along with his amended account, respondent also transmitted to Roy a preliminary copy of a closing settlement statement that he had received from the escrow officer during their earlier discussions.  The preliminary closing statement contained a line item on which to enter an "attorney's fee"; however, this line item had been left blank on the copy respondent forwarded to Roy. In his accompanying facsimile cover sheet, respondent warned Roy that the transmitted settlement statement did not "show the $3,650.00" fee.

{¶ 19} On the closing settlement statement presented on November 28, however, the line item for the "attorney's fee" was no longer blank.  It contained a figure of $3,650 to be paid to A. Robert Hutchins.  The escrow officer testified before the panel that she had filled in this line item at respondent's specific direction after he assured her that he was entitled to $3,650 as an "attorney's fee" in the transaction.  The escrow officer further testified that if respondent had told her to identify this fee as a commission, she would have included it in the line

---

3.  Because the divorcing couple's house ultimately sold "by owner," the listing agent did not claim a commission on the sale.

4.  According to respondent, this $500 fee was actually charged by the title company for document review.

item for "broker's commission." She added, however, that as a lawyer and not a real estate agent, respondent was not entitled to a real estate commission.

{¶ 20} At the closing, respondent was paid $3,650. Later, in connection with the couple's final divorce decree, respondent's client agreed to pay her ex-husband $2,000 for his share of the sale proceeds.

{¶ 21} As to Count Two, relator charged that respondent committed additional violations of DR 1–102(A)(4), (5), and (6). The panel found that although respondent's conduct was "questionable," in that he "failed to disclose to the joint owner of a home that he was acting as a real estate agent in the sale of the home," his actions did not constitute the charged misconduct. The panel thus recommended that this count be dismissed.

{¶ 22} In recommending a sanction for this misconduct, the panel found that respondent, who represented himself at the hearing, did not offer any mitigating evidence other than that he had no history of disciplinary sanctions. See Section 10 of the Rules and Regulations Governing Complaints and Procedure Before the Board of Commissioners on Grievances and Discipline. The panel also found mitigating that although respondent had fabricated an entry to facilitate the closing, the terms of the entry were consistent with what he could reasonably assume was his and Roy's agreement concerning the transaction. Moreover, although respondent had charged a fee for his assistance in finding a buyer for the couple's house, the panel found that he at least had charged less than the standard real estate commission.

{¶ 23} Respondent urged the panel to dismiss the complaint in its entirety, but the panel accepted relator's suggestion that respondent's license to practice law be suspended for six months. Contrasting its recommendation with the sanction issued in *Disciplinary Counsel v. Eisenberg* (1998), 81 Ohio St.3d 295, 690 N.E.2d 1282, in which an attorney violated DR 1–102(A)(4), (5), and (6) by directing an assistant to replicate signatures of estate beneficiaries on documents without their knowledge and then filing those documents in court, the panel explained:

{¶ 24} "Although Eisenberg received * * * a public reprimand, the Panel in the instant matter believes that Respondent's actions were more significant * * *. The creation of a journal entry by 'cutting and pasting' the signatures of opposing counsel and a judicial officer along with a phony time stamp of the Court far exceeds the conduct of Eisenberg."

{¶ 25} The board adopted the panel's findings of misconduct relative to Count One. As to Count Two, the board found that respondent had also violated DR 1–102(A)(4) and (6) because he had committed acts of "fraud and misrepresentation." The board recommended that respondent be suspended from the practice of law for six months.

{¶ 26} Respondent objects to the board's report, insisting that the events underlying the findings of misconduct were the result of inadvertence and mistake, not intentional wrongdoing. Respondent first claims that when he prepared the new Agreed Magistrate's Order, he thought that he had reproduced the substance of the attorneys' agreement concerning his client's receipt of the sale proceeds to pay her out-of-pocket expenses. He claims that he had therefore instructed his secretary to place Roy's signature and his on the new order to manifest their agreement and that he anticipated filing the order for court approval at a later time. However, according to respondent, his secretary went too far. She additionally reproduced the duty magistrate's signature on the order in the space provided and added the October 30, 2001 certification of filing. Respondent concedes that he did not review his secretary's work before she transmitted the new Agreed Magistrate's Order to the title company.

{¶ 27} Respondent also emphasizes that he advised his client and Roy of the fact that he expected to take a fee from the closing proceeds and, thus, did not engage in any duplicitous behavior toward Roy or her client. Respondent contends that he fulfilled whatever disclosure duties he owed by informing Roy of the fee before closing. He further points out that Roy did not raise any objection to his lists of itemized expenses on which he identified the $3,650. Thus, according to respondent, he reasonably assumed that Roy understood his closing figures and had agreed to them.

{¶ 28} Respondent's explanations notwithstanding, we agree with the board that he acted with deliberate cunning in securing his fee from the closing proceeds. As relator argues, respondent never identified the $3,650 expense in his negotiations with Roy as anything other than the seller's agent's commission or listing fee. Thus, in light of the fact that Roy knew that the divorcing couple had signed a listing contract, she naturally assumed that this fee would be paid to the listing agent under contract. Roy's inexperience in closing real estate transactions, a fact of which she advised respondent, also assisted his sleight-of-hand. The first itemized list of expenses respondent supplied for Roy's review, the list she actually saw prior to the closing, contained a $500 line item for attorney fees. Roy again assumed that respondent intended to take this amount as his attorney fee.[5] Together, these factors allowed respondent to charge a $3,560 fee to which Roy had not agreed on behalf of her client and for which her client effectively paid half due to the disbursement of all sale proceeds to respondent's client. This conduct constitutes a violation of DR 1–102(A)(4) and (6).

---

5. Roy testified that she had thought respondent's inclusion of this fee was somewhat presumptuous but decided not to contest it so as not to derail their impending sale agreement.

{¶ 29} Moreover, although respondent urges a lesser sanction than the six-month actual suspension imposed in *Disciplinary Counsel v. Ball* (1993), 67 Ohio St.3d 401, 618 N.E.2d 159, we find *Ball* instructive. In *Ball,* an attorney totally failed to supervise work done by a nonlawyer employee, resulting in large misappropriations of his clients' money and many missed filing deadlines. We held that attorney to a strict standard of accountability for his employee's unsupervised conduct and suspended his license to practice law for six months. We explained:

{¶ 30} "Delegation of work to nonlawyers is essential to the efficient operation of any law office. But, delegation of duties cannot be tantamount to the relinquishment of responsibility by the lawyer. Supervision is critical in order that the interests of clients are effectively safeguarded. (See EC 6–4: 'Having undertaken representation, a lawyer should use proper care to safeguard the interests of his client.')"

{¶ 31} Respondent represents that the new Agreed Magistrate's Order was the product of misunderstanding and confusion; however, neither the panel nor the board believed that the fabricated order was a completely innocent mistake. To the contrary, as the board observed: "It is often said and is certainly true in this case that the ends may not justify the means. The creation of a journal entry by fabricating the signatures of opposing counsel and a judicial officer is abhorrent to our legal system." We concur in this assessment, especially because we are convinced that respondent consciously took advantage of Roy's unwitting efforts to reach an agreeable division of property in what had been a contentious divorce.

{¶ 32} For these reasons, we agree that respondent acted with the requisite intent for finding violations of DR 1–102(A)(4), (5), and (6), and 7–102(A)(5) relative to Count One. And although we have reviewed respondent's resume, submitted since the panel hearing without objection, we further find that the combination of this misconduct with his violations of DR 1–102(A)(4) and (6) relative to Count Two requires a sanction more severe than the public reprimand issued to the attorney who arranged for the forgery of signatures in *Disciplinary Counsel v. Eisenberg* (1998), 81 Ohio St.3d 295, 690 N.E.2d 1282. There, the misconduct was an isolated incident, it had no adverse financial consequences, and the signatures were placed on legitimate estate documents for the convenience of the signers. These mitigating factors do not exist here.

{¶ 33} Accordingly, we apply the rule that when an attorney engages in a course of conduct that violates DR 1–102(A)(4), the attorney will be actually suspended from the practice of law for an appropriate period of time. *Disciplinary Counsel v. Fowerbaugh* (1995), 74 Ohio St.3d 187, 658 N.E.2d 237, syllabus.

Respondent is, therefore, suspended from the practice of law in Ohio for six months. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, LUNDBERG STRATTON, O'CONNOR and O'DONNELL, JJ., concur.

————————

Jonathan E. Coughlan, Disciplinary Counsel, and Lori J. Brown, First Assistant Disciplinary Counsel, for relator.

Kettlewell & Kettlewell, L.L.C., Charles W. Kettlewell and Charles J. Kettlewell, for respondent.