DISCIPLINARY COUNSEL *v.* BOWMAN.

[Cite as *Disciplinary Counsel v. Bowman,*
110 Ohio St.3d 480, 2006-Ohio-4333.]

(No. 2006–0444—Submitted May 23, 2006—Decided August 23, 2006.)

LUNDBERG STRATTON, J.

{¶ 1} We must decide in this case how to appropriately sanction respondent, Kevin Arthur Bowman of Dayton, Ohio, Attorney Registration No. 0068223, admitted to the Ohio bar in 1997, who stipulated that he had violated several Disciplinary Rules while representing clients in three cases. The Board of Commissioners on Grievances and Discipline recommended a sanction of suspension from the practice of law for two years, with one year stayed on conditions, and a term of probation. We hold this sanction to be inadequate.

{¶ 2} In June 2005, relator, Disciplinary Counsel, filed a complaint charging respondent with professional misconduct in three counts. The complaint alleges that respondent committed misconduct when he was employed as a senior associate with the Dayton, Ohio, law firm of Sebaly, Shillito & Dyer ("SS & D").

{¶ 3} A panel of the Board of Commissioners on Grievances and Discipline heard the cause and made findings of fact, conclusions of law, and a recommendation, which the board adopted.

## Misconduct

### Count I (Jones Representation)

{¶ 4} Daniel and Leslie Jones retained respondent to defend them in a lawsuit filed by Peoples Community Bank. The bank had filed a $2.8 million cognovit judgment against the Joneses, and the Joneses paid respondent a $5,000 retainer to represent them. After investigating the underlying facts of the case, respondent concluded that the case was not winnable. Nevertheless, respondent filed an action against the bank to set aside the cognovit judgment, and the bank offered a settlement that respondent concluded was reasonable.

{¶ 5} The Joneses rejected the offer, but respondent forged the signature of the Joneses and their former attorney, Timothy R. Evans, on the settlement agreement. Respondent then filed a motion to dismiss the case with prejudice and provided a copy of the motion and the forged settlement agreement to the Joneses.

{¶ 6} The Joneses contacted SS & D through their new attorney and requested the return of their retainer. When SS & D confronted respondent about the incident, he claimed that the Joneses were lying. SS & D suspended respondent, at which time he admitted to SS & D that he had signed the settlement agreement without the authorization of Evans, but asserted that he had the Joneses' permission to sign their names. When questioned by police, however, respondent admitted that he had forged all the signatures.

{¶ 7} The board found that respondent had violated DR 1–102(A)(4) (barring an attorney from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); 1–102(A)(5) (barring conduct that is prejudicial to the administration of justice); 1–102(A)(6) (barring conduct that adversely reflects upon an attorney's fitness to practice law); 7–101(A)(1) (barring an attorney from intentionally failing to seek the lawful objectives of a client); 7–101(A)(2) (barring an attorney from failing to fulfill a contract of employment); 7–102(A)(3) (barring an attorney from concealing or knowingly failing to disclose that which he is required by law to reveal); 7–102(A)(5) (barring an attorney from knowingly making a false statement of law or fact); and 7–102(A)(8) (barring an attorney from knowingly engaging in illegal conduct or conduct that violates a Disciplinary Rule).

## Count II

### Miami University Representation

{¶ 8} In June 2002, respondent filed a complaint in federal court against DuBois Book Store, Inc., on behalf of Miami University, alleging a violation of Miami's intellectual-property rights. In October 2002, DuBois Book Store offered to agree to an injunction and offered to pay a portion of Miami University's legal fees. Respondent failed to timely respond to DuBois Book Store's offer, and the bookstore withdrew its offer to pay attorney fees. Although respondent informed Miami University of the initial settlement offer at the time, he never advised SS & D or Miami University that the bookstore had withdrawn its offer to pay the attorney fees.

{¶ 9} Respondent faxed the bookstore's counsel a draft settlement agreement that had been agreed to by Miami University and the Attorney General. The agreement provided that the bookstore pay Miami University $5,000 in damages

and reimburse Miami University's legal fees up to $7,500. The bookstore presented a counteroffer, but respondent failed to convey it to Miami University.

{¶ 10} Later, respondent faxed the bookstore's counsel a letter accepting its counteroffer, which did not include any payment of damages or attorney fees to Miami University. He also lied in telling opposing counsel that Miami University had agreed to the bookstore's settlement offer. DuBois Book Store submitted an executed settlement agreement to respondent, but he never informed Miami University of the settlement terms.

{¶ 11} The case was dismissed with prejudice. Respondent later lied to Miami University's General Counsel, Robin Parker, and also to his co-counsel about the terms of the settlement. He falsely informed Parker that DuBois Book Store had accepted the agreement proposed by Miami University. Respondent faxed a document to Parker that appeared to have been signed by a DuBois Book Store representative, as well as a document purporting to be a dismissal order. Respondent had cut the signature from the agreement actually signed by the bookstore representative but never provided to Miami University, pasted it to a separate document, and made a clean copy of the signature page that he then sent to Miami University.

{¶ 12} Respondent forwarded Parker a copy of the agreement, along with a cover letter asking Parker to have the agreement executed by Miami University and returned. Along with the agreement, respondent provided a $5,000 cashier's check, which he identified as the first payment to Miami University from the bookstore, but which was actually the retainer from the Joneses. An authorized Miami University representative executed the document, and Parker returned it to respondent, who never filed the purported agreement with the federal court.

{¶ 13} When questioned about the $7,500 balance owed, respondent drafted a letter dated September 21, 2003, to Parker purporting to send a $7,500 cashier's check. Respondent placed the letter and photocopy of a fictitious $7,500 cashier's check in the case file, but he never sent the letter to Parker. In doing so, he stalled for time to obtain the $7,500 that Miami University was expecting. Later, respondent paid Miami University $7,500 out of his own personal funds. When Miami University later discovered what had occurred, it filed a motion for relief from judgment, and the federal court vacated its previous dismissal order and issued a permanent injunction against DuBois Book Store.

{¶ 14} The board found that respondent had violated DR 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), 7–101(A)(1), 7–102(A)(3), 7–102(A)(5), and 7–102(A)(8).

### Count III

### Doyle Representation

{¶ 15} In state court, respondent represented Robert Doyle in a lawsuit against Mutual of Omaha Insurance Company involving an alleged breach of an

insurance contract. Respondent voluntarily dismissed the lawsuit and later refiled it in federal court. Respondent never supplied the initial disclosures required under Fed.R.Civ.P. 26(a) requested by counsel for Mutual of Omaha.

{¶ 16} Counsel for Mutual of Omaha filed a motion to compel discovery and to disqualify Doyle's expert witnesses because respondent had disclosed the expert's names over a month late. Counsel also filed a motion for sanctions. Respondent failed to respond, and later, without the approval of Doyle, he moved to dismiss the lawsuit, and the case was dismissed with prejudice. Respondent lied to his firm about the status of the case, and he was later fired as a result of the three incidents alleged in Counts I, II, and III.

{¶ 17} The board found that respondent had violated DR 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), 6–101(A)(3), 7–101(A)(1), and 7–101(A)(2).

## Sanction

{¶ 18} The panel recommended that respondent be suspended from the practice of law for two years, with one year stayed on the condition that respondent complete his current contract with the Ohio Lawyers Assistance Program ("OLAP") and remain on probation for an additional two years, during which time he would remain in mental-health treatment and under a contract with OLAP similar to his current one. Moreover, the panel recommended that respondent provide to Disciplinary Counsel a letter from his qualified treating psychologist at the conclusion of the second year of his suspension. The letter was to verify respondent's adherence to the treatment plan and to indicate whether respondent is able to return to the competent, ethical, and professional practice of law under specified conditions. On March 2, 2006, the board certified its findings of fact, conclusions of law, and recommendations, adopting the panel's findings and recommending that respondent be suspended from the practice of law for two years with one year stayed upon conditions, followed by two years of probation.

{¶ 19} Relator objects to the recommended sanction, contending that given the severity of respondent's misconduct, the case warrants, at a minimum, an indefinite suspension from the practice of law.

{¶ 20} Because the parties stipulated to the disciplinary violations, the sole issue before the court today is the sanction. The appropriate sanction in a case of professional misconduct depends on "the duties violated, the actual injury caused, the attorney's mental state, the existence of aggravating or mitigating circumstances, and sanctions imposed in similar cases." *Stark Cty. Bar Assn. v. Buttacavoli,* 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16; *Disciplinary Counsel v. King,* 103 Ohio St.3d 438, 2004-Ohio-5470, 816 N.E.2d 1040, ¶ 21; *Disciplinary Counsel v. Hunter,* 106 Ohio St.3d 418, 2005-Ohio-5411, 835 N.E.2d 707, ¶ 34.

*Injury to Clients*

{¶ 21} The panel declined to find that respondent "intentionally * * * [p]reju-dice[d] or damage[d] his client during the course of the professional relationship" and thus declined to find any violation of DR 7–101(A)(3). The panel concluded that relator did not provide clear and convincing evidence that any of the clients suffered actual prejudice or damage. We disagree. Respondent intentionally damaged his clients by lying, forging their signatures, neglecting their legal matters, dismissing their cases, and fostering the retraction of an offer to pay a client's attorney fees. In all three counts, respondent treated clients, counsel, and his own colleagues with deceit and dishonesty. He also violated his duty to the legal system, the profession, and the community.

*Aggravating and Mitigating Circumstances*

{¶ 22} In determining the sanction for respondent's misconduct, we must review the aggravating and mitigating features of respondent's case. See Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg.").

{¶ 23} We adopt the board's findings in aggravation that respondent committed his misconduct with a dishonest or selfish motive, BCGD Proc.Reg. 10(B)(1)(b), although his conduct was tempered by his diagnosed depression. Further, we adopt the board's findings that respondent engaged in a pattern of misconduct, BCGD Proc.Reg. 10(B)(1)(c), and committed multiple offenses, BCGD Proc.Reg. 10(B)(1)(d).

{¶ 24} Regarding mitigation, we adopt the board's findings that respondent has no prior record of professional discipline, BCGD Proc.Reg. 10(B)(2)(a), made a timely, good-faith effort to make restitution and rectify the consequences of his misconduct, BCGD Proc.Reg. 10(B)(2)(c), made a full and free disclosure to the board and had a cooperative attitude, BCGD Proc.Reg. 10(B)(2)(d), had a diagnosis of a mental disability pursuant to BCGD Proc.Reg. 10(B)(2)(g), and showed genuine remorse and sorrow.

*Respondent's Mental State*

{¶ 25} To have significant mitigating effect under BCGD Proc.Reg. (10)(B)(2)(g), a mental disability must be supported by all of the following: (1) a diagnosis of a mental disability by a qualified health-care professional, (2) a determination that the mental disability contributed to the misconduct, (3) a sustained period of successful treatment, and (4) a prognosis from a qualified health-care professional that the attorney will be able to return, under specified

conditions if necessary, to the competent, ethical, and professional practice of law. BCGD Proc.Reg. 10(B)(2)(g)(i), (ii), (iii), and (iv).

{¶ 26} Stephanie Krznarich, a licensed independent social worker and certified chemical dependency counselor, testified at respondent's hearing. Krznarich is the Associate Director and Clinical Director of OLAP. She first met respondent in November 2004, when she conducted a chemical-dependency and mental-health assessment. She diagnosed respondent with dysthymia, a low-level depression that lasts two or more years. Respondent was experiencing anhedonia, a loss of pleasure in things once enjoyed, difficulty concentrating and focusing, and memory lapses. In addition, respondent had a sense of hopelessness, difficulty falling asleep, difficulty staying asleep, and suicidal ideation. Respondent told her that the stressors in his life resulted from unresolved grief regarding the loss of a dear friend and colleague and the loss of his mother after a prolonged illness.

{¶ 27} According to Krznarich, respondent suffered a skull fracture when he was hit by a car at age 17. Krznarich testified that traumatic brain injury can lead to poor impulse control, depression, anxiety, paranoia, sexual preoccupation, and poor anger management.

{¶ 28} Krznarich testified that respondent had signed a three-year OLAP mental-health contract. His obligation was to call OLAP daily, seek psychological counseling, investigate occupational counseling, exercise three times per week, play a musical instrument for at least ten minutes a day, and not harm himself.

{¶ 29} Krznarich testified that initially, respondent did well in contacting the OLAP office as required by his contract, but from January 1, 2005, until September 28, 2005, respondent did not make contact with OLAP. However, he did continue his therapy during that time. After September 2005, respondent's contact improved, and Krznarich testified that at the time of the hearing, he was compliant with his contract.

{¶ 30} Krznarich saw respondent again in October 2005 and testified at the December 2005 hearing that respondent was taking care of himself and was taking his medications and that his symptoms had improved. Krznarich also testified that as long as respondent takes his medication and participates in counseling, he will have the tools to deal with daily life stressors. Krznarich testified that she believed respondent's symptoms contributed to his misconduct. Krznarich also testified that respondent had demonstrated guilt and shame regarding his misconduct and as recently as 48 hours before the hearing offered to resign his license to practice law.

{¶ 31} Respondent also testified. He said that in April 2002, a former associate at his firm who had been a mentor to him died at the age of 33. Respondent began to think about his own mortality, and this event triggered a

period when respondent was "overworked and overstressed" and began to neglect cases.

{¶ 32} In early 2003, respondent's mother was diagnosed with cancer. Respondent was living in Dayton, and his mother was in Cincinnati, so respondent's wife went to Cincinnati to take care of his mother five days a week. The situation created stress for his immediate family and finances. Moreover, respondent felt guilty because he was too busy to visit his mother while she was ill. Respondent testified that he began to lose his ability to concentrate. In addition, respondent's involvement in a trademark case that required frequent travel caused stress on his marriage.

{¶ 33} Respondent submitted a letter written in December 2005 by Dr. Kimberly Tate, a clinical psychologist, who had diagnosed respondent with "major depression recurrent" and general anxiety disorder. The letter stated her opinion, with a reasonable degree of certainty, that if respondent "continues to take his medications and work on the issues referenced in [her] previous letter, Mr. Bowman is currently able to practice competent, ethical professional practice [sic] of law."

### Sanctions in Similar Cases

{¶ 34} We have held that when an attorney has engaged in a course of conduct that violates DR 1–102(A)(4) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation), the attorney will be actually suspended from the practice of law for an appropriate period of time. *Disciplinary Counsel v. Fowerbaugh* (1995), 74 Ohio St.3d 187, 191, 658 N.E.2d 237.

{¶ 35} Relator notes that we have called the "fabrication of a judicial officer's signature 'abhorrent to our legal system.' " *Disciplinary Counsel v. Insley,* 104 Ohio St.3d 424, 2004-Ohio-6564, 819 N.E.2d 1109, ¶ 12, quoting *Disciplinary Counsel v. Hutchins,* 102 Ohio St.3d 97, 2004-Ohio-1805, 807 N.E.2d 303, ¶ 31. In *Insley,* we issued an indefinite suspension. Respondent in this case fabricated both a client's signature and the signature of another attorney. We find the deception equally abhorrent to our legal system. But we are permitted to "temper the sanction we impose for a lawyer's dishonesty to a client and court upon proof that mental disability caused the misconduct, under some circumstances." *Toledo Bar Assn. v. Lowden,* 105 Ohio St.3d 377, 2005-Ohio-2162, 826 N.E.2d 836, ¶ 19, citing BCGD Proc.Reg. 10(B)(2)(g).

{¶ 36} We find that respondent's psychological mitigation justifies a lesser sanction than the indefinite suspension sought by relator. Although not as significant as in *Lowden,* Krznarich testified that respondent's depression contributed to his misconduct. Moreover, respondent's willingness to commence treatment and his present ability to practice law, as noted by both Krznarich and

the psychologist, are persuasive. However, we note that much of respondent's conduct involves active lying and deceit, rather than the neglect of client matters that is more common in cases involving depression. Moreover, we note that respondent allowed a nine-month period to pass in 2005 without contacting the OLAP office daily, contrary to his agreement with OLAP.

{¶ 37} In *Cincinnati Bar Assn. v. Stidham* (2000), 87 Ohio St.3d 455, 721 N.E.2d 977, Stidham failed to deposit client funds in an identifiable bank account, failed to maintain records of funds and render an appropriate accounting, failed to promptly pay funds that the client was entitled to receive, and otherwise neglected entrusted legal matters. Due to Stidham's depression, we imposed a two-year suspension with one year stayed on conditions. We find Bowman's misconduct more extreme than that demonstrated in *Stidham*.

{¶ 38} *Disciplinary Counsel v. Golden,* 97 Ohio St.3d 230, 2002-Ohio-5934, 778 N.E.2d 564, involved an attorney whose pattern of neglect of client matters and failure to cooperate in the disciplinary investigation resulted from her debilitating clinical depression. Although we issued an indefinite suspension, we did so to protect the public because the attorney's misconduct involved eight cases that spanned several years. Id. at ¶ 23. Respondent's depression and depression-related issues contributed to his misconduct. Respondent fully cooperated with the relator and the board and has been found by his treating psychologist to be *currently* able to practice law ethically and competently.

{¶ 39} Respondent's acknowledgement of his need for mental-health services and his seeking professional advice and using the services offered by OLAP are commendable. While an indefinite suspension is not merited due to defendant's mental-health disability, we hold that a two-year suspension is warranted in order to protect the public and to ensure that respondent is able to successfully manage his illness.

## Conclusion

{¶ 40} Thus, respondent is hereby suspended from the practice of law for two years. To ensure that respondent successfully manages his condition, he is ordered to complete his current OLAP contract and to provide quarterly reports to relator about his progress throughout his suspension period. Prior to reinstatement, respondent shall supply to relator a letter from his qualified treating psychologist, indicating his adherence to the treatment plan and the recommendations of the psychologist and including a statement that respondent will be able to return to the competent, ethical, and professional practice of law under specified conditions. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

---

Jonathan E. Coughlan, Disciplinary Counsel, and Stacy Solochek Beckman, Assistant Disciplinary Counsel, for relator.

Lane Alton & Horst, L.L.C., and Alvin E. Mathews Jr., for respondent.